**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harold Joseph ROSENTHAL, Philip Anthony Bonadonna, Robert Edward Dunleavy, Jr., George Lombardi, Garland Hubert Watson, Larry Roger Stewart, Joseph Vincent Junker, Defendants-Appellants.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Rose Marie JUNKER, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Dennis Wayne WILSON, Defendant-Appellee.**

**Nos. 84–8969, 85–8108 and 85–8217.**

United States Court of Appeals, Eleventh Circuit.

July 18, 1986.

Bruce S. Harvey, Atlanta, Ga., for Stewart.

Paul Kehir, Snellville, Ga. (court-appointed), for Wilson.

Howard J. Manchel, Atlanta, Ga. (court-appointed), for Rose Marie Junker.

Before GODBOLD, Chief Judge, VANCE, Circuit Judge, and THOMAS *, Senior District Judge.

DANIEL HOLCOMBE THOMAS, Senior District Judge:

## I.

## INTRODUCTION

This is a drug conspiracy case wherein appellants were charged with engaging in racketeering by conspiring to participate in a large scale organization to smuggle and distribute cocaine.

Appellants were members of a large cocaine smuggling operation referred to as "southern comfort". The federal grand jury for the Northern District of Georgia returned a fifty-five count indictment against thirty defendants. Of the thirty defendants seven were granted an interlocutory appeal severance [1] and thirteen were either fugitives or entered guilty pleas, hence, only ten defendants went to trial.[2] At the conclusion of the trial, eight defendants were convicted under various counts of the indictment, one was found not guilty and one was acquitted on motion.[3] Count One, in which eight appellants were charged and convicted, charged conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), in viola-

Craig Gillen, Asst. U.S. Atty., Atlanta, Ga., for U.S.

R.C. Cougill, Lilburn, Ga. (court-appointed), for Rosenthal.

Steven H. Sadow, Atlanta, Ga., for Bonadonna.

Arthur W. Tifford, Miami, Fla., for Dunleavy.

Frank J. Petrella, Atlanta, Ga., for Lombardi.

William T. Payne, Atlanta, Ga. (court-appointed), for Watson.

Gil Howard, Atlanta, Ga. (court-appointed), for Joseph Junker.

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. *See United States v. Boldin,* 772 F.2d 719 (11th Cir.1985).

2. The following defendants were on trial in this case: Harold Joseph Rosenthal, Philip A. Bonadonna, Robert Edward Dunleavy, Sergio Pantoja, George Lombardi, Garland Hubert Watson, Larry Roger Stewart, Dennis Wayne Wilson, Rose Marie Junker and Joseph Vincent Junker.

3. Sergio Pantoja was found not guilty. The trial court granted Dennis Wayne Wilson's motion for judgment of acquittal.

tion of 18 U.S.C. § 1962(d). Count Two is a RICO substantive count, 18 U.S.C. § 1962(c) in which seven appellants were charged and five were convicted. Count Three, in which only appellant Rosenthal was charged and convicted and Count Four, in which only appellant Bonadonna was charged and convicted, charged engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. Counts Nine, Ten, Eleven, Twelve, Fourteen and Fifteen, in which seven appellants were charged and four were convicted, charge importation of cocaine in violation of 21 U.S.C. § 963. Count Thirteen, in which four of the appellants were charged and three were convicted, charged conspiracy to import cocaine in violation of 21 U.S.C. § 952. Counts Sixteen, Eighteen, Nineteen and Twenty, in which eight appellants were charged and six were convicted, charged possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Counts Thirty-one, Thirty-six through Thirty-nine and Counts Forty-two, Forty-five, Forty-seven and Fifty, in which seven appellants were charged and five were convicted, charged interstate travel to carry on an unlawful activity in violation of 18 U.S.C. § 1952(a)(3).

Eight appellants appeal here raising, collectively, twenty-one issues.[4] In addition, the government appeals from the trial court's ruling granting an acquittal in favor of Dennis Wayne Wilson. For clarity, we have separated the issues into the following categories: (1) sufficiency of the evidence; (2) pre-trial rulings; (3) trial rulings; (4) jury charges and post-verdict rulings; and (5) Wilson's acquittal.

## II.

## THE FACTS

Only a brief overview of the facts are presented here; the facts most pertinent to each issue are discussed separately.

In September 1981, appellant, Harold Rosenthal, escaped from a federal correctional facility in Memphis, Tennessee. Thereafter, Rosenthal fled to Colombia, South America, where he organized a large cocaine smuggling operation. Because of the many facets of this network, we have divided the facts into the following phases: (1) The Tennessee phase; (2) the Crystal River and LaFayette phase; (3) the Paulding County, Georgia phase; (4) the Bahamas and Reading, Pennsylvania, phase; (5) Rosenthal's arrest; and (6) the post-arrest phase.

### (1). *The Tennessee Phase*

During the first week in June 1982, 640 pounds of cocaine were flown from Colombia into the Rockwood, Tennessee airport. Appellant Garland Watson was to secure the airport and take the load to the "stash house". After distributing several kilograms of cocaine as payment to the pilots and ground crew, the cocaine was taken to Florida and sold for $370,000. Within the next two weeks, two additional loads of cocaine were flown into Rockwood, Tennessee and sold in Florida. A fourth load, consisting of over 1,000 pounds of cocaine arrived in July. After receiving a tip, the Drug Enforcement Administration (DEA) arrested all individuals transporting the cocaine.

### (2). *The Crystal River and LaFayette Phase*

During the late summer of 1982, a plane was flown to Colombia to pick up a load of cocaine. The plane was loaded with fifteen or sixteen duffle bags of cocaine. The plane crashed on take-off and burned; the two passengers, however, escaped unharmed. In furtherance of the conspiracy another plane was purchased. Upon arrival in Colombia, the plane was loaded with fifteen duffle bags of cocaine and flown to Crystal River, Florida. Another load of 633 pounds of cocaine was flown to LaFay-

---

**4.** All appellants except Dennis Wayne Wilson, a cross-appellant, adopt the arguments raised by their co-appellants.

ette, Georgia. When the plane landed the F.B.I. arrested the passengers and several others.

### (3). *The Paulding County Phase*

In September 1982, DEA Agent Thomas Thompson was introduced to Loy Shipp by the Paulding County Sheriff. Shipp agreed to cooperate with the government. He told Agent Thompson that he traveled to Medellin, Colombia, in July 1982, to meet with Rosenthal, and thereafter, Shipp said he received $50,000 as a down payment to purchase an aircraft.

On October 7, 1982, Shipp and Agent Thompson traveled to Fort Lauderdale, Florida where Shipp met with appellant Philip Bonadonna and Charles Alaimo. After the meeting Shipp delivered $120,000 to Agent Thompson. On October 13, 1982, Shipp and Agent Thompson acting undercover, met Bonadonna and Alaimo at the Atlanta airport. At this meeting, Bonadonna discussed the purchase of an aircraft and utilization of vehicles to transfer drugs to a stash house. Thereafter, $50,000 was delivered to Shipp and Agent Thompson. On October 19, 1982, Bonadonna and Alaimo delivered $250,000 to Shipp and Agent Thompson. Over the next two months over $450,000 was delivered to Thompson and Shipp. Appellant Robert Dunleavy delivered $40,000 to Agent Thompson in January. Finally, in February 1983, Michael Leonard, an undercover DEA agent, flew to Colombia with Shipp to pick up a load of cocaine. When they arrived in Colombia, several duffel bags of cocaine were placed on the aircraft. They flew from Colombia to Dobbins Air Force Base outside of Atlanta.

Approximately 755 pounds of cocaine was unloaded into a van which Agent Thompson drove to the stash house. Two days later, two white Chevrolet automobiles left the stash house. These vehicles had Florida license plates YD5860 and YD5861. The vehicles, under surveillance by DEA agents, traveled in a southerly direction toward Florida. One vehicle was driven by appellants Joseph and Rose Ma-

rie Junker, who were subsequently arrested in Pompano, Florida. The other car was seized and the driver was arrested in Tamaral, Florida. Approximately one-half of the 755 pounds of cocaine delivered to the stash house was in the Junker car.

### (4). *The Bahamas and Reading, Pennsylvania Phase*

In the fall of 1982, Russell Zoellner, Jr. was recruited by his father, Russell Zoellner, Sr., to assist him in flying cocaine from Colombia to the Bahamas for Rosenthal. Zoellner, Jr. assisted his father in "plumbing" an aircraft to be used in the smuggling operation. Zoellner, Sr. had previously used appellant Larry Stewart to fly a load of cocaine for Rosenthal. Zoellner, Jr. saw his father give Stewart $7,500 for the previous trip.

This phase of the operation consisted of four loads of over 1800 pounds of cocaine flown into the Bahamas from Colombia.

In the Spring of 1983, Zoellner, Jr. and Stewart flew to Boca Raton, Florida, in order to purchase a 200 gallon bladder tank. They then flew to the Bahamas, refueled, and headed for Colombia. This trip was aborted, however, due to technical trouble with the plane.

In June 1983, appellant George Lombardi delivered $12,500 to Zoellner, Jr. to pay for Zoellner, Sr.'s flight school. Apparently, Rosenthal wanted Zoellner, Sr. to learn to fly one of the aircrafts for use in the smuggling operation. Thereafter, Rosenthal decided to purchase another aircraft and sent Lombardi and Dunleavy to deliver $75,000 to Zoellner, Jr. The Zoellners exchanged the aircraft previously used and paid $60,000 in cash for a Queen Aire N113T.

In late August 1983, the Zoellners flew the Queen Aire to Colombia where they met Rosenthal. The plane was loaded with 1000 pounds of cocaine. Although they were headed to Reading, Pennsylvania, strong winds forced them to land in Chattanooga, Tennessee. The cocaine was placed in a storage unit in Dalton, Georgia. The

next day, the Zoellners and Dunleavy drove to the storage unit and loaded half of the cocaine into a rental car which was subsequently driven to Florida. Dunleavy placed the rest of the cocaine in a recreational vehicle.

On September 12, 1983, Zoellner, Jr. flew to Miami, Florida, where Lombardi and Dunleavy gave him $175,000 to purchase a Super DC3 aircraft. Zoellner, Jr. purchased the Super DC3 in California for $160,000. The Zoellners flew the Super DC3 to Colombia on September 25, 1983. Approximately 500 pounds of cocaine was loaded on the Super DC3 and the next day they flew to Reading, Pennsylvania.

### (5). *Rosenthal's Arrest*

During the late summer of 1983, the Colombian National Police located Rosenthal's residence in Colombia and, on their own initiative, obtained a court order to place a wiretap on Rosenthal's phone. During one conversation, Rosenthal discussed murdering the Colombian Minister of Justice. Thereafter, the Colombian government became interested in expelling Rosenthal back to the United States. Several DEA agents traveled to Colombia to be present during the arrest. Rosenthal was arrested on September 27, 1983, and thereafter the house was searched by Colombians in the presence of the DEA agents.

Rosenthal was incarcerated in Miami. There, Rosenthal contacted DEA Agent Charette to discuss the possibility of his (Rosenthal's) cooperation. While Rosenthal was talking with the DEA he was planning an escape. Prior to his proposed escape, however, he was transferred to the Atlanta Penitentiary. Letters seized from the Atlanta Penitentiary indicate that Rosenthal continued to participate in drug smuggling activities.

### (6). *Post-Arrest Phase*

After Rosenthal's capture, Bonadonna continued the cocaine smuggling operation. Bonadonna associated with Bruce Litsky from August 1981 until January 20, 1984.

Unknown to Bonadonna, Litsky began working with the F.B.I. in October 1982.

On November 3, 1983, Lombardi informed Litsky that the head of the organization had recently been arrested in Colombia. Lombardi said that Bonadonna was in charge of transportation and distribution of the cocaine and that Bonadonna received $2,000 per kilo for his services.

### III.

### SUFFICIENCY OF THE EVIDENCE

Appellants, Rosenthal, Bonadonna, Dunleavy, Lombardi, Stewart, Joseph and Rose Marie Junker and Watson, contend that there was insufficient evidence to support their convictions.

■ Challenges to the sufficiency of the evidence are measured by the standard set forth in *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B) (en banc), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), as follows: "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of evidence." In making this determination, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accept reasonable inferences and credibility choices by the fact-finder. *United States v. Gonzalez,* 719 F.2d 1516, 1521–22 (11th Cir.1983).

### *Rosenthal and Bonadonna*

■ Both Rosenthal and Bonadonna were convicted of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. A person is considered to have engaged in a continuing criminal enterprise if he violates any provision of 21 U.S.C. §§ 801, *et seq,* governing drug abuse prevention and control, in the course of a

continuing series of like violations undertaken in concert with five or more other persons "with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management," as a result of which that person obtains substantial income or resources. *United States v. Bascaro*, 742 F.2d 1335, 1357 (11th Cir.1984).

■ Rosenthal argues that the record does not indicate that he supervised five or more persons. He contends that the record only indicates that he supervised the following individuals: (1) David Warren; (2) Loy Shipp; (3) Russell Zoellner, Jr.; and (4) appellant, Philip Bonadonna. We disagree.

■ During the Tennessee phase, evidence indicates that Rosenthal supervised and communicated with David Warren, Chuck Boldin and Philip Bonadonna, and they in turn, supervised the activities of several participants. An individual need not have direct communications with participants in order to be their supervisor. In *United States v. Phillips*, 664 F.2d 971, 1034 (5th Cir. Unit B 1981), this court concluded that if a defendant personally hires only the foreman, that defendant is still responsible for organizing the individuals hired by the foreman to work as the crew. We find that mere delegation of authority does not detract from Rosenthal's ultimate status as organizer.

Bonadonna contends that there was insufficient evidence to convict him under 21 U.S.C. § 848 because the government failed to prove that he had committed "a continuing series of violations." We disagree.

■ This court interprets "a continuing series of violations" to mean three or more violations. *United States v. Brantley*, 733 F.2d 1429, 1436 (11th Cir.1984). Bonadonna argues that the trial court's failure to request the jury to utilize special verdict interrogatories in rendering its verdict on the § 848 count, makes it impossible to determine which three predicate acts they found to satisfy § 848.

■ Bonadonna was convicted of the following violations: (1) Count Thirteen, conspiracy to import cocaine in violation of 21 U.S.C. 963; (2) Count Fourteen, the importation of cocaine in violation of 21 U.S.C. 952; and, (3) Count Nineteen, possession with intent to distribute in violation of 21 U.S.C. 841(a)(1). Bonadonna argues that the jury may also have considered two acts, described as overt acts of the RICO conspiracy charged in Count One, involving the importation and possession with intent to distribute cocaine into Reading, Pennsylvania, and two drug trafficking acts described by Bruce Litsky in his testimony, but not the subject of any count in the indictment.

Bonadonna contends that because the two Reading, Pennsylvania acts were identified as overt acts and predicate offenses in the RICO Counts (Counts One and Two) and were not the basis for a separate count and conviction, these acts should not be considered as predicate acts under § 848. We disagree.

In *United States v. Brantley*, 733 F.2d 1429, 1436 n. 14 (11th Cir.1984), this court indicated that "whether an overt act in violation of the drug laws can be a predicate offense under § 848 when it is not the basis for a separate count and conviction" is an open question in this circuit.

Courts in other circuits have consistently held that use of such unindicted offenses is permissible in obtaining a conviction under § 848. *See U.S. v. Markowski*, 772 F.2d 358, 361–62 (7th Cir.1985); *U.S. v. Becton*, 751 F.2d 250, 256 (8th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *U.S. v. Young*, 745 F.2d 733, 747 (2d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *U.S. v. Sterling*, 742 F.2d 521, 526 (9th Cir.1984), *cert. denied*, — U.S. — 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); *Sperling v. U.S.*, 692 F.2d 223, 226 (2d Cir.1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 72 L.Ed.2d 1366 (1983) ("The law requires merely that there be evidence that the defendant committed three substantive offenses—even if not charged in

separate indictments—to provide the predicate for a § 848 conviction."); *see also U.S. v. Collier*, 358 F.Supp. 1351 (E.D.Mich. 1973), *aff'd*, 493 F.2d 327 (6th Cir.), *cert. denied*, 419 U.S. 831, 95 S.Ct. 56, 42 L.Ed.2d 57 (1974). In addition to this impressive array of authority, we find the reasoning of Judge Easterbrook for the Seventh Circuit in *Markowski* persuasive:

The language of § 848(b)(2) refers to a "continuing series of violations" of the drug laws but does not define "violation." Several courts have understood "violation" to refer to an offense, whether or not the offense led to conviction. See [cases cited above]. As the Supreme Court emphasized in *Garrett*, 105 S.Ct. at 2412–15 [*Garrett v. U.S.*, —— U.S. ——, 105 S.Ct. 2407 (1985) ], the CCE statute is not a sentence enhancement provision or an aggravated version of an offense. It is a distinct crime that entails the supervision of a substantial criminal enterprise. What is important is proof that there was indeed a far-flung operation. Whether this has led to other convictions is all but irrelevant to the nature of the CCE offense. This leads us to interpret "violation" in the natural way as an offense, not as a conviction.

The structure of the statute reinforces the conclusion. The penalty provision in § 848(a) provides for additional enhancement in the event of multiple convictions: "any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years ..., to a fine of not more than $100,000, and to ... forfeiture ...; except that if any person engages in such activity after one or more prior *convictions* of him under this section, he shall be sentenced to a term of imprisonment which may not be less than 20 years ..." (emphasis added). Subsection (b), in contrast, refers only to "violations". We do not think that Congress used two different words in the same section of the statute to mean the same thing. None of the legislative history which *Garrett* discusses in detail, leads to a contrary conclusion.

772 F.2d at 361–62

■ Bonadonna next argues that the two drug violations detailed during Bruce Litsky's testimony should not have been included because these acts were not stated in the indictment or in the bill of particulars.

■ Here the government did not advise Bonadonna that the acts described by Litsky would constitute elements of the § 848 charge until the close of the government's case. A bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy. Nor is the government required to provide defendants with all overt acts that might be proven at trial. *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir.1978). Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection. *U.S. v. Colson*, 662 F.2d 1389 at 1391 (11th Cir.1981). Here, because the trial record indicates that Bonadonna was in possession of the Jencks' material and tape recordings of Litsky several weeks in advance of his testimony. Bonadonna has failed to demonstrate any actual prejudice. *U.S. v. Johnson*, 575 F.2d 1347 at 1357 (5th Cir.1978).

■ Finally, Bonadonna argues that it was erroneous for the conspiracy to import cocaine offense, 21 U.S.C. 963, to be considered as one of the predicate violations under § 848. We disagree. *United States v. Boldin*, 772 F.2d 719 (11th Cir.1985); *United States v. Brantley*, 733 F.2d 1429, 1436 (11th Cir.1984).

### *Dunleavy*

Dunleavy was convicted on the following counts: Count One, RICO conspiracy; Count Two, RICO substantive; Count Thirteen, unlawful importation of cocaine; Counts Fourteen and Fifteen, unlawful possession with intent to distribute; and,

Count Fifty-Two, interstate transportation in aid of racketeering. Dunleavy complains that the trial court erred in failing to grant his motion for judgment of acquittal, which he timely filed, alleging insufficiency of the evidence for all counts against him.

In order to prove a substantive RICO violation · the government must prove the following elements:

(1) the existence of an enterprise which affects interstate or foreign commerce; (2) that the defendant 'associated with' the enterprise; (3) that the defendant participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity, i.e., by committing at least two acts of racketeering activity designated in 18 U.S.C.A. § 1861(1). *United States v. Bright, supra,* 630 F.2d [804] at 829 [(5th Cir.1980)]; *United States v. Elliott,* 571 F.2d 880, 897–99 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

*United States v. Phillips,* 664 F.2d 971, 1011 (5th Cir. Unit B 1981).

In addition:

[i]n proving a RICO conspiracy, the government does not have to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive RICO crime described in the indictment, or knew his fellow conspirators, or was aware of all the details of the conspiracy. *See United States v. Cagnina,* 697 F.2d 915 (11th Cir.) *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). That each conspirator may have contemplated participating in different and unrelated crimes is irrelevant. *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313, 1319 (7th Cir.) (en banc), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). Finally, there is no requirement that each defendant must have agreed to commit two predicate acts of racketeering activity. *United States v. Carter,* 721 F.2d 1514, 1528–31 (11th Cir.1984). The government need only prove that each defendant conspired to commit the

substantive RICO offense and was aware that others had done likewise. [*U.S. v.*] *Sutherland,* 656 F.2d [1181] at 1193, 1194 [(5th Cir.1981)]. *See [U.S. v.] Elliott,* 571 F.2d [880] at 903 [(5th Cir. 1978)].

*United States v. Pepe,* 747 F.2d 632, 659–60 (11th Cir.1984).

 The evidence showed that Dunleavy delivered money to undercover Agent Thompson and government informant Shipp for preparations for the Paulding County load of cocaine on February 11, 1983. In addition, Dunleavy telephonically coordinated messages and activities between South America and the stash house in Paulding County. After the cocaine arrived at the stash house Dunleavy told Alaimo that "everybody was happy." It was necessary for Dunleavy to be present at the house when the cocaine arrived. As a co-conspirator, he is responsible for the substantive acts committed within the scope of the conspiracy. *United States v. Newbern,* 731 F.2d 744 (11th Cir.1984).

In July 1983, Dunleavy delivered $75,000 to Zoellner, Jr. for the purchase of the Queen Aire aircraft that was used to fly 1000 pounds of cocaine to Chattanooga, Tennessee, in August 1983. In addition, Dunleavy and Lombardi delivered $175,000 to Zoellner, Jr. to purchase the Super DC3 aircraft. That aircraft was used to fly cocaine in to Reading, Pennsylvania, on September 26, 1983. We find no error.

### Lombardi

 Lombardi was convicted on Count One; Count Two; Count Fifteen, importation of cocaine in violation of 21 U.S.C. § 952; and, Count Twenty, possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

One of Lombardi's primary functions was to deliver monies to further the objectives of the conspiracy. On June 12, 1983, Lombardi delivered $12,500 to Zoellner, Jr. in order to send Zoellner, Sr. to flight school. As stated previously, in July 1983, Lombardi and Dunleavy delivered money to Zoellner, Jr. to purchase the Queen Aire

aircraft, and delivered the money necessary to purchase the Super DC3 aircraft. Based on the foregoing we find no merit to Lombardi's contentions.

### Stewart

Stewart was convicted on Count One, RICO conspiracy. He contends that because the government specified in the indictment that the RICO conspiracy was based on two predicate acts and since he was acquitted of those acts, the trial court erred in failing to grant his motion for acquittal.

 Each count in an indictment is separately considered, and if it is supported by evidence, may stand; inconsistency between verdicts on different counts of the indictment does not vitiate convictions on those counts of which the defendant is found guilty. *United States v. Varkonyi*, 611 F.2d 84 (5th Cir.1980); *United States v. Romeros*, 600 F.2d 1104 (5th Cir.1979), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980).

 Stewart argues that when the government in the indictment alleges a RICO conspiracy based on two predicate acts, the RICO conspiracy verdict cannot stand if he is acquitted of those two predicate acts.

In *United States v. Carter*, 721 F.2d 1514, 1531 (11th Cir.1984), this court held that when a defendant agrees to participate in the conduct of an enterprise's affairs with the objective of violating a substantive RICO provision, it is not necessary that the defendant agree to personally commit two predicate acts for the required pattern of racketeering.

In November of 1982, Russell Zoellner, Jr. observed his father pay $7,000 to Stewart for a previous cocaine importation trip from South America. Stewart confirms Russell Zoellner, Jr.'s testimony in a tape recorded conversation with B.J. Jones. In his conversation with B.J. Jones, Stewart suggests flying cocaine loads into the Chattanooga Airport, and storing the airplane in his hangar. After Stewart had been paid $7,500 by Zoellner, Sr., in November of 1982, he helped Russell Zoellner, Jr. and Sr. plumb an aircraft.

Late in May or June of 1983, Zoellner, Jr. and Stewart flew from Dalton, Georgia, to Boca Raton, Florida. When they arrived in Miami, a 200 gallon bladder tank was purchased for the aircraft. Stewart and Zoellner, Jr. departed the United States and flew to the Bahamas. From there they headed to Colombia, South America, to pick up a cocaine load and return to the Bahamas. The airplane encountered technical problems, forcing them to return to the Bahamas.

Stewart's previous cocaine load with Zoellner, Sr., his attempted cocaine load with Zoellner, Jr., and his recorded conversation wherein he discussed the use of his hangar to store cocaine, clearly indicate his knowledge of the RICO conspiracy and his participation in it.

We find no error in the trial court's failure to grant Stewart's motion of acquittal.

### Joseph Vincent Junker

 Joseph Junker was convicted of Count One, RICO conspiracy; Count Nineteen, possession with intent to distribute cocaine; and Count Forty-five, interstate transportation in aid of racketeering. Joseph Junker attacks the validity of his convictions alleging that there was insufficient evidence to show his intent to join the conspiracy. We find sufficient evidence in the record to support his convictions. On February 12, 1983, the Junkers were observed leaving a known stash house in Dallas, Georgia, in a white Chevrolet automobile. The car was kept under surveillance and was stopped and searched near Pompano Beach, Florida, on February 13, 1983. The car was being driven by Joseph Junker, occupied by his wife, Rosemarie Junker, and contained six duffle bags of cocaine.

### Rose Marie Junker

Rose Marie Junker argues that the evidence presented at trial was insufficient to sustain her convictions on Count One,

RICO conspiracy; Count Nineteen, possession with intent to distribute cocaine; and Count Forty-five, interstate travel in aid of racketeering. We have reviewed the record and, again we must conclude that there is sufficient evidence to uphold her convictions. See above, Joseph Junker participation.

### Watson

■ Watson was convicted of Count One, RICO conspiracy; Count Two, RICO substantive; and Count Thirty-one, interstate transportation in aid of racketeering. Watson argues that the government failed to produce any evidence that he agreed to join the conspiracy or that he agreed to violate a substantive RICO provision by participating in the affairs of an enterprise through a pattern of racketeering activity. In addition, he alleges that there was insufficient evidence to convict him of interstate travel in aid of racketeering. The record is replete with evidence of Watson's participation and involvement such that we find no merit to his contentions.

### IV.(a)
### PRE–TRIAL RULINGS

■ Joseph Junker complains that the trial court's refusal to question potential jurors regarding the principles of reasonable doubt and the presumption of innocence constituted reversible error. We disagree.

This precise issue was addressed in *United States v. Ledee*, 549 F.2d 990, 991–92 (5th Cir.1977), and *United States v. Miller*, 758 F.2d 570 (11th Cir.1985). In *Ledee*, rather than ask the potential jurors whether they accepted the principles of burden of proof, presumption of innocence, and reasonable doubt, the court asked the jurors whether they had any reason to believe they "could not follow the law as stated by the court, [regardless of] whether [they agreed] with the law or not." 549 F.2d at 992. At the close of the case, the court instructed the jurors on the principles of burden of proof, presumption of innocence, and reasonable doubt. On appeal, the

Fifth Circuit found no error since it is not an abuse of discretion to refuse to allow inquiries of jurors as to whether they can accept certain propositions of law. *Id.* at 992.

### IV.(b)
### SEARCH OF ROSENTHAL'S RESIDENCE IN COLOMBIA

Rosenthal contends that due to Fourth Amendment violations the trial court erred in failing to grant his motion to suppress monitored telephone conversations from his home in Colombia and evidence seized from his residence after his arrest. We disagree.

■ From September 10, 1983, until September 27, 1983, Rosenthal's residential telephone was monitored by the Colombian law enforcement officials as authorized by a Colombian Magistrate. Rosenthal was arrested on September 27, 1983, pursuant to an expulsion order issued by Colombian authorities. After the arrest, Rosenthal's residence was searched by Colombian National Police. Present at the search was Lt. Betancur, the Chief of the Anti-Drug Corps of the Colombian National Police, eight or nine D.A.S. (Colombian Immigration) Agents and four American federal agents. The Colombians were interested in arresting Rosenthal, expelling him from the country and searching his house for information regarding an assassination attempt on the Colombian Minister of Justice. Evidence obtained by foreign police officers from searches carried out in their own countries is generally admissible in American courts regardless of whether the search complied with the Fourth Amendment. *Government of Canal Zone v. Sierra*, 594 F.2d 60 (5th Cir.1979). The reasoning usually tendered in support of this limitation is the doubtful deterrent effect on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court. *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976). There are two exceptions to the general rule. The first, which is not applicable here, provides for exclusion of the evidence if the conduct of the foreign offi-

cers shocks the conscience of the American court. The second exception, which Rosenthal argues is applicable here, provides that if American law enforcement officials substantially participate in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts, the exclusionary rule can be invoked. 537 F.2d at 139. Here, testimony indicates that the decision to arrest Rosenthal was made by Lt. Betancur. The day before the arrest American and Colombian agents met at the DEA office where the American agents were apprised of the specific plans for the arrest and advised of the Colombian's plans to search Rosenthal's residence. At the request of the Colombian National Police, the American agents were present when the residence was searched but testimony indicates that all evidence was seized by the Colombian officials.

■ Fourth Amendment rights are generally inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials are present and cooperate in some degree. *Government of Canal Zone v. Sierra,* 594 F.2d 60 (5th Cir.1979). In *Stonehill v. United States,* 405 F.2d 738 (9th Cir.1968), the Ninth Circuit held that before the Fourth Amendment applies, the participation of federal agents must be so substantial so as to convert the search into a joint venture.

■ Judge Tidwell, after having heard the evidence, in applying the same to the law, determined that the American officers' participation in the search did not constitute a joint venture. He determined this from the facts. He ultimately concluded that the search was legal. This was a mixed question of law and fact. We find that his determination of the facts was not clearly erroneous and his application to the law was not in error. The search being not violative of the Fourth Amendment rendered the evidence further admissible.

## IV.(c)
## ILLEGAL ARREST

■ Rosenthal contends that the circumstances surrounding his arrest and subsequent transport back to the United States deprived the federal district court of jurisdiction to try him.

Rosenthal was arrested on September 27, 1983, as has heretofore been discussed. After his arrest, he was transported back to the United States.

The *Ker-Frisbie* doctrine, which holds that a defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence, is directly applicable to the case at hand. This court has previously discussed this circuit's adherence to the *Ker-Frisbie* doctrine as follows:

This doctrine takes its name from two cases in which the Supreme Court rejected the due process claims of defendants who had been brought by force into the jurisdictions in which they were tried. *See Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). This circuit's adherence to the *Ker-Frisbie* doctrine was unequivocally established in *United States v. Winter,* 509 F.2d 975 (5th Cir.) *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), which the former Fifth Circuit declared:

[W]e are convinced that under well established case law of the Supreme Court and this Circuit, a defendant in a federal criminal trial whether citizen or alien, whether arrested within or beyond the territory of the United States may not successfully challenge the District Court's jurisdiction over his person on the grounds that his presence before the Court was unlawfully secured.

*Id.* at 985–86, *see also United States v. Postal,* 589 F.2d 862, 873 (5th Cir.) ("A defendant may not ordinarily assert the illegality of his obtention to defeat the court's jurisdiction over him"), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).

*United States v. Darby,* 744 F.2d 1508, 1530–31 (11th Cir.1984).

 Rosenthal argues that the case at bar falls into the exception to the *Ker-Frisbie* doctrine created by the Second Circuit in *United States v. Toscanino,* 500 F.2d 267 (2nd Cir.1974). This court has declined to adopt the *Toscanino* approach, *United States v. Darby,* 744 F.2d 1508 (11th Cir. 1984), but even if *Toscanino* was applicable Rosenthal would not benefit from it since there is no evidence of conduct which shocks the conscience. Nor do we find merit in Rosenthal's argument that the actions of the United States violate this country's extradition treaty with Colombia. Under international law it is the contracting foreign government that has the right to complain about a violation. *United States v. Reed,* 639 F.2d 896, 902 (2nd Cir.1981).

### IV.(d)

### FAILURE TO SUPPRESS HANDBAG

 Lombardi contends the trial court's failure to suppress evidence seized from his residence without a search warrant during his arrest constitutes reversible error.

On May 24, 1984, a hearing was held before a United States Magistrate on Lombardi's motion to suppress evidence from his residence. The findings of fact, as set forth in the Magistrate's report and recommendation are as follows:

"On January 21, 1984, three DEA agents, one FBI agent and a police officer went to defendant's residence to execute an arrest warrant for defendant. The officers were admitted inside the house by one of defendant's children. Defendant was informed he was under arrest. He was informed of his *Miranda* rights. The officers refrained from handcuffing defendant because defendant requested he not be handcuffed in front of his children.

"It was explained to defendant that he would be taken to jail. He was asked if there was anything he wished to take along. Defendant and DEA agent Ledwith entered defendant's bedroom when he requested that he be allowed to take some

medicine with him. Agent Ledwith explained to defendant he would not be allowed to have the medicine at the jail but that he would be able to see a physician who would prescribe anything for him that was needed. It was suggested that defendant choose some shoes and more clothing to bring with him. Agent Ledwith allowed defendant to point to what he wanted in the closet and then the agent removed the items for him.

"Agent Ledwith then asked defendant if he had any identification to bring with him to be used for processing and in the bond hearing. Defendant pointed out a black leather bag. Defendant had been seen earlier that morning by agent Ledwith carrying the same bag. The bag was not within defendant's immediate reach though he did begin to move toward it. Agent Ledwith prevented defendant from approaching the bag. Another DEA agent, agent Church, picked up the bag and looked in it. The bag contained a Florida dirver's [sic] license with defendant's photo but with the name George Viola. The bag also contained an empty prescription bottle, six loose Valium tablets and a pill box with some other pills in it. Agent Ledwith decided to bring the bag with them but did not allow defendant to take possession of it. Defendant now seeks to suppress all evidence obtained as a result of the search and seizure of the black bag."

The Magistrate concluded that the search of Lombardi's handbag was a valid search made incident to a lawful arrest and hence the evidence contained in the handbag was admissible. The trial court adopted the Magistrate's report and recommendation.

We find that here, the search and seizure of the handbag was incident to a lawful arrest which is an exception to the warrant requirement of the Fourth Amendment. *See, e.g., Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Savage,* 564 F.2d 728 (5th Cir. 1977).

## IV.(e)
## SEVERANCE

██ Joseph Junker, Stewart, Watson, Lombardi and Dunleavy allege trial court error for refusing to grant their motions for severance. They contend that the evidence presented against each of them was minimal when compared with the evidence presented against other co-defendants which they contend was so prejudicial that it "spilled over" and thereby prevented them from receiving a fair trial. We disagree.

In *United States v. Alvarez*, 755 F.2d 830, 856–57 (11th Cir.1985), this court clearly set out the law on severance in this circuit. It needs no further elaboration in this opinion.

The case at hand involved the trial of ten defendants. Prior to opening statements, the trial court specifically instructed the jury that although the defendants were being tried together, each defendant was to be given separate consideration. Again, in the charge to the jury, the trial court carefully instructed the jury to consider each defendant and each charge separately. Furthermore, the verdicts, wherein one defendant was found not guilty and other defendants were found guilty on some counts and not guilty on others, clearly indicate the jury's ability to consider each defendant and charge separately.

## IV.(f)
## PROSECUTORIAL MISCONDUCT

██ Dunleavy complains that the trial court erred in denying his motion to dismiss counts one and two of the indictment alleging prosecutorial misconduct which he contends resulted from the government's improper joinder of separate conspiracies into one indictment.

On October 28, 1982, several of the defendants charged in the instant proceedings were indicted in Rome, Georgia, for the LaFayette phase of this case. Dunleavy contends that the overt acts perpetrated by the "LaFayette group" constitute a separate conspiracy from the one in which he was allegedly involved.

Dunleavy argues as follows: "The Rome prosecution was tried by the government in such a manner as to render unobvious its knowledge and awareness of other persons who could have and should have been alleged as co-conspirators in the conspiracy charged in that case: namely, the other defendants charged in this indictment. The conspiracy alleged in Count One of this indictment, the racketeering enterprise alleged in Count Two of this indictment and the continuing criminal enterprise alleged in Count Eight of this indictment are: (a) sufficiently similar to the conspiracy alleged in the Rome prosecution ... as to render manifest that the government knew of and intentionally bifurcated into separate, temporal units, one overall conspiracy, or (b) sufficiently admitted the separate nature and distinct temporal units making up what is now alleged in Counts One, Two and Eight to be one all-inclusive conspiracy and racketeering enterprise."

Dunleavy's contention that the government intentionally concealed its knowledge of other co-conspirators is unsupported in the record. The indictment in the LaFayette cases alleges a conspiracy continuing until October 25, 1982. The indictment in the instant case alleges Dunleavy's first involvement in the conspiracy to have occurred on about December 6, 1982. We find no merit in Dunleavy's argument since the indictment alleges, and the evidence supports the fact that Dunleavy did not participate in the conspiracy until after the date of the LaFayette indictment.

██ Nor has Dunleavy caught the government in a contradiction. Through RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy to obtain this result.

Congress acted against the backdrop of hornbook conspiracy law. Under the general federal conspiracy statute the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that

agreement constitutes the conspiracy which the statute punishes. *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942).

In the context of organized crime, this principle inhibited mass prosecutions because a single agreement or "common objective" cannot be inferred from the commission of highly diverse crimes by apparently unrelated individuals. RICO helps to eliminate this problem by creating a substantive offense which ties together these diverse parties and crimes.

*United States v. Elliott*, 571 F.2d 880, 902 (5th Cir.1978).

In the instant case, Count Two of the indictment charged Dunleavy and others with violation of § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Count One charged Dunleavy and others with conspiring to violate § 1962(c) in violation of § 1962(d).

■ In *United States v. Smith*, 574 F.2d 308 (5th Cir.1978), the defendant had been convicted in an earlier trial of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846 and possession of marijuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). He was subsequently indicted for a substantive RICO violation and for conspiracy to violate RICO. Seventy-two overt acts were alleged in the RICO indictment; five of those acts relating to attempts to bribe public officials, had also been alleged to support the earlier marijuana conspiracy conviction. However, the RICO indictment did not allege any drug offenses as "racketeering activity" as it could have under 18 U.S.C. § 1961(1)(D). The Fifth Circuit held that the previous conspiracy to distribute conviction did not bar the RICO conspiracy because "the marijuana conspiracy and the RICO conspiracy, even if parts of a single larger conspiracy, are separate offenses

..." *Id.* at 311. The RICO statutes permit the joinder into a single RICO count or counts several diverse predicate acts, including conspiracies, all which further the goals of the enterprise. As such, Dunleavy's argument that the government is caught in a dilemma of either admitting two separate conspiracies or, on the other hand, alleging a single RICO conspiracy, is without merit.

## IV.(g)
## MULTIPLICITY

Dunleavy argues that Count One, RICO conspiracy, 18 U.S.C. § 1962(d) and Count Thirteen, conspiracy to import cocaine, 21 U.S.C. § 963, are either multiplicitous or in violation of the double jeopardy clause. Hence, he alleges trial court error for failing to do one of the following: (1) Sever Counts One and Thirteen; (2) force an election between Counts One and Thirteen; or in the alternative, (3) dismiss either Count One or Thirteen.

■ Multiplicity is the charging of the same crime in several counts of a charging document. *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). In situations in which a single offense is charged in separate charging instruments, the defendant is subjected to multiple prosecutions in violation of the double jeopardy clause. When analyzing whether separate offenses may be carved out of a single incident, courts have turned to the tests used for ascertaining double jeopardy clause violations because of the similarity. *United States v. Chrane*, 529 F.2d 1236 (5th Cir.1976).

■ In *United States v. Boldin*, 772 F.2d 719, 727–28 (11th Cir.1985), this court, applying the *Blockburger/Albernaz* test, held that there was no double jeopardy violation for prosecution of RICO conspiracy, 18 U.S.C. § 1962(d) and conspiracy to import, 21 U.S.C. § 963. Since it is established that a § 963 conspiracy violation and an 18 U.S.C. § 1962(d) RICO conspiracy, are separate violations, Dunleavy's argu-

ment that Counts One and Thirteen are multiplicitous is also without merit.

### V.(a)
### TRIAL RULINGS

■ Rosenthal and Bonadonna allege that they were led to believe by one Loy Shipp, whom they allegedly thought was a C.I.A. agent, that their drug smuggling activities were part of an intelligence operation undertaken in pursuit of national security objectives. They contend the trial court erred in limiting their proposed evidence regarding their "C.I.A. defense" and erred by rejecting their proposed instruction which set forth this defense.

It is well settled that ignorance of the law or mistake as to the law's requirements is not a defense to criminal conduct. *United States v. International Minerals and Chemicals Corp.*, 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971). The few limited exceptions to the mistake of law rule are set out in *United States v. Duggan*, 743 F.2d 59 (2nd Cir.1984), as follows:

> There is an exception for legitimate reliance on an official interpretation of law. *See, e.g., Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *United States v. Mancuso*, 139 F.2d 90 (3d Cir.1943). There is also an exception for responding to a police officer's call for assistance in making unlawful arrests or searches. *See People v. Weiss*, 276 N.Y. 384, 12 N.E.2d 514 (1938).

743 F.2d at 83

These exceptions have no application to the facts at hand. Rosenthal and Bonadonna base their C.I.A. defense on the "reliance of apparent authority" exception set forth in Judge Wilkey's opinion in *United States v. Barker*, 546 F.2d 940 (D.C.Cir. 1976). We are urged, as was the court in *Duggan* to adopt Judge Wilkey's reasoning. The *Duggan* court analyzed the *Barker* decision as follows:

> *Barker* involved defendants who had been recruited to participate in an allegedly top-secret national security operation aimed at foreign agents leaking intelligence information and led by E. Howard Hunt, whom defendants knew first hand to be a long-time CIA agent then employed in the White House. Defendants' convictions were reversed, and the case was remanded for a new trial, by a 2–1 vote, with Judges Merhige and Wilkey in the majority. Those two judges agreed that the defendants might have a valid defense based on an exception to the mistake of law rule, but they disagreed on the parameters of the exception.
>
> Judge Merhige recognized only the traditional exception to the mistake of law doctrine for reasonable reliance on a conclusion or statement of law issued by an official charged with interpretation, administration, or enforcement in the relevant legal field. 546 F.2d at 955 (opinion of Merhige, J.). Judge Wilkey's opinion proposed instead to recognize a defense based on reliance on apparent authority, requiring a showing of 'both (1) facts justifying [the defendants'] reasonable authority and (2) a legal theory on which to base a reasonable belief that Hunt possessed such authority.' 546 F.2d at 949 (opinion of Wilkey, J.), (emphasis in original).

743 F.2d at 83–84.

The *Duggan* court specifically rejected Judge Wilkey's apparent authority exception stating:

> We decline to adopt Judge Wilkey's view that a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real.

743 F.2d at 84.

In *United States v. Kelly*, 556 F.2d 257 (5th Cir.1977), the Fifth Circuit declined to express an opinion on the divergent views offered in *Barker*. Here, however, we are forced to take a position that we think the better view is in accordance with the *Duggan* Court's position that a defendant may only be exonerated on the basis of his reliance on real and not merely apparent authority.

Officials of the C.I.A. or any other intelligence agency of the United States do not have the authority to authorize conduct which would violate "the constitution or statutes of the United States", including federal narcotics laws. Exec. Order No. 12333, 3 C.F.R. 200 (1982). Because the C.I.A. had no real authority to authorize the drug violations involved here, Rosenthal and Bonadonna's theory that they were acting on apparent authority of a C.I.A. agent is not a viable defense.

Rosenthal and Bonadonna cite *Smith v. United States,* 592 F.Supp. 424 (E.D.Va. 1984), for the contention that their reasonable belief that they were acting pursuant to C.I.A. intelligence gathering activities, even though the alleged C.I.A. agent might not have had official authorization, constitutes a valid *mistake-of-fact* defense, and thus, the trial court erred in limiting their presentation of this defense. We find that *Smith* is distinguishable from the case at hand.

In *Smith,* the defendant was charged with the unlawful disclosure of classified information to an agent of the Soviet Union in violation of the Espionage Act. The defendant alleged that C.I.A. agents had directed him to reveal the information. The district court held that the defendant's reasonable belief that C.I.A. agents had directed him to reveal the information was a defense to the charges. In reaching its decision, the *Smith* court rejected the government's reliance on *Barker* as follows:

In *Barker* the defendants' mistake was clearly one of law. The defense was based on an erroneous legal conclusion, implicitly communicated to the defendants by persons who were unquestionably White House officials, that the President, or his highest advisers, could legitimately authorize national security burglaries. In contrast, Smith did not base his actions on a mistaken perception of the law. First, the government does not contend that Smith was confused or mistaken as to the legal conditions under which a person may be deemed to be a

CIA agent. If Smith was mistaken, his mistakes were factual in nature. Based on White and Ishida's extensive knowledge of secret INSCOM information, he allegedly believed their factual representations that they were directing covert operations, including his own, on behalf of the CIA. Persons who direct covert CIA operations undoubtedly satisfy the legal definition of a CIA agent. Second, the government does not maintain that Smith misconstrued the legal authority of a CIA agent, acting on behalf of the CIA, to permit disclosure of classified information. It does not suggest that CIA agents may not authorize disclosure of classified information.

592 F.Supp. at 432.

The case at hand is distinguishable from *Smith* because here, as in *Barker,* the defense was based on an erroneous legal conclusion that the C.I.A. could violate federal drug laws. Here, the government contends, and it is law, that the C.I.A. is prohibited from violating the statutes of the United States and hence, a C.I.A. agent could not lawfully authorize the violation of the federal drug laws. The *Smith* court recognized that "[t]he court undoubtedly has authority to exclude evidence offered by the defense which, *if believed,* fails to establish a legally cognizable defense." 592 F.Supp. at 428, (emphasis in original). Here, because we agree with the trial court's determination that the defendants' C.I.A. theory was not a viable defense, we must conclude that the trial court did not error in limiting evidence on this defense or in failing to so instruct the jury.

█ Finally, Rosenthal complains that the trial court's delayed ruling on the validity of the C.I.A. defense denied him a fair trial. He contends the trial court in effect "pulled the rug out from under him" by failing to rule on the issue until after Rosenthal had testified for several days. We disagree.

After defense counsel presented their opening statements the government filed a motion *in limine* to prohibit the introduction of evidence pertinent to defendants'

C.I.A. defense. Thereafter, the court allowed the parties to argue their respective positions on the motion. At that time defense counsel for Bonadonna stated, "But I'm asking the court at this point in the motion in limine saying to deny the motion in limine as to the presentation of defense evidence vis-a-vis the CIA and then, of course, the court will have to reconsider what it does after the evidence comes in, but I think we have the right to introduce the evidence." (Vol. 40, pg. 106 of Transcript). Rosenthal's counsel concurred. Following counsel's arguments the court ruled as follows:

I agree that as I understand the thrust of the defendants—defense of apparent authority that it would be irrelevant and immaterial in this case. The CIA has no authority to either violate or authorize the violation of the drug violations that are involved in this case and to attempt to prove in any way that they were sanctioned or approved by the CIA would be irrelevant and immaterial.

However, I think the plaintiff's—or the government's motion is too broad. I'm not sure what the government means by the CIA defense or what I understand the CIA defense or what the defendants CIA defense what they mean by that or we all mean the same thing.

There are some areas where some reference to the CIA may be appropriate.....

... But insofar as the general thrust, as I understand it, of the CIA defense and apparent authority I agree with the government and will attempt at appropriate times and subject to appropriate objections to exclude it from its admissible—exclude such evidence from the jury's consideration.

I agree to a certain extent with some of the references insofar as to the—what the government witnesses have said about the CIA defense but that was, it seems to me, was in response to some of the implications of the defendants cross-examination. However, I would be—would seriously entertain and would probably give a request to charge instructing the jury to disregard Mr. Lit-

sky's or anybody elses reference to the CIA defense if one of the defendants wishes to tender it. (This is obviously an error on the part of the court as he could only have meant the prosecution)

But I guess with that explanation, I think the government's brush is a little too broad, so I deny the motion in limine in toto, but I think I have sufficiently stated my position.

Based on the foregoing, we find that the court gave Rosenthal and his counsel adequate notice of the court's position on the CIA defense. With this knowledge, Rosenthal chose to testify and cannot now claim error for a trial tactic of his own choosing.

### V.(b)

 Watson alleges trial court error for failing to grant his motion in limine in which he sought to exclude a video tape made in a Florida hotel room which depicts Watson and others allegedly using cocaine. He contends that substantial portions of the tape are inaudible and therefore the transcript prepared by the government, which was given to the jury, should have been excluded since it was merely the government's version of what was said. We find Watson's argument regarding the inaudibility of the video tape and use of the transcripts to be without merit.

The proper procedure of the use of transcripts is discussed in *United States v. Onori*, 535 F.2d 938, 947–49 (5th Cir.1976), and restated in *United States v. Wilson*, 578 F.2d 67, 69–70 (5th Cir.1978), and *United States v. Llinas*, 603 F.2d 506, 509 (5th Cir.1979), as follows:

Initially, the district court and the parties should make an effort to produce an "official" or "stipulated" transcript, one which satisfies all sides. If such an "official" transcript cannot be produced, then each side should produce its own version of a transcript or its version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.

Regarding Watson's contention that the transcript is merely the government's version of the conversation, we note that "[i]f the government's translation was inaccurate, it was petitioner's burden to challenge its accuracy by presenting another translation, so that the jury could choose which version to believe." 603 F.2d at 509.

At no time did Watson tender or offer to tender a transcript of the tape containing a different version of the conversation. Furthermore, the trial court instructed the jury as to the proper use of the transcript as follows:

> Ladies and Gentlemen of the Jury, as you have just heard, Exhibit 82–A has been identified as a typewritten transcript of the oral conversation which can be heard on the videotape recording, which has been received in evidence as Exhibit 82. The transcript purports to identify the speakers engaged in such conversation.
>
> I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listened to the tape recording, and also to aid you in identifying the speakers.
>
> However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation, or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript and from your own examination of the transcript in relation to your hearing the videotape recording itself as the primary evidence of its own contents, and if you should determine that the transcript is in any respect incorrect, unreliable you should disregard it to that extent.

■ Watson next complains that the tape should have been excluded pursuant to Fed.R.Evid. 403 because one party refers to stealing an ashtray from the motel room and, in addition, the tape gives the impression that the parties were using cocaine.

In *United States v. Watchmaker*, 761 F.2d 1459 (11th Cir.1985) appellants challenged the admissibility of a taped telephone conversation wherein various crimes and bad acts were discussed. This court stated:

> In making determinations under Rule 403, the court is accorded broad discretion, which is reviewed only for clear abuse. *United States v. King, supra.* [713 F.2d 627 (11th Cir.1983) ]

761 F.2d at 1471–72.

After a review of the record we find no abuse of discretion in the trial court's ruling.

The videotape was seized from Jackie Wayne Scarborough's recreational vehicle when he was arrested immediately after the fourth load of cocaine came into Rockwood, Tennessee, on July 13, 1982. The videotape was clearly probative of Watson's knowledge and involvement in the importation of the third load of cocaine and his knowledge of preparations for the fourth load of cocaine.

Furthermore, the trial judge instructed the jury on these matters. He stated as follows:

> Now Ladies and Gentlemen of the jury, I also instruct you that there have been— there are various—or most of the tape recording has contained extraneous matters that have no bearing on the issues involved in this case.
>
> There was some conversation about stealing ashtrays, that was some conversation about coke, and if you determine that that conversation relates to using cocaine, of course, that would be a matter for you to determine, and the use of cocaine in this—on this tape would have no bearing on any of the issues in this case.
>
> Any other matter extraneous to the issues in this case should not also been considered by you in arriving at your determination in this case.

■ Finally, Watson complains that there is insufficient authentication of the

time frame of the tape recording pursuant to Fed.R.Evid. 901. We disagree.

As stated above, the tape was seized on July 13, 1982. The tape itself contains conversations which indicate that the parties were in Panama City, Florida. In addition, the conversation also reflects that they are staying in the room under an alias with the address of 411 Tedder Road having been given on registration documents.

Government Exhibit 131 is a motel receipt from the Dunes of Panama, reflecting that a room was rented in the name "Charles Bryant" with an address of 411 Tedder Road on July 6, 1982. This exhibit, the motel receipt, was located in Room 135 of the Coachman Inn located in Louden, Tennessee. The receipt was found after the fourth load of cocaine was seized and Scarborough and several other defendants were arrested in Cleveland, Tennessee, on July 11, 1982. Based on the foregoing, the tape was made between July 6, 1982, and July 11, 1982. We find no error.

### V.(c)

Stewart contends that his statement made to government officials[5] was inadmissible because it was made as part of plea negotiations and hence should have been excluded pursuant to F.R.Crim.P. 11(e)(6)(D).

There is conflicting testimony regarding the circumstances surrounding the taking of Stewart's statement. Stewart's trial counsel, Ken Gordon, testified that he personally discussed the matter with Assistant United States Attorney Gillen prior to Stewart's interview. Gordon told Gillen that Stewart was willing to cooperate and Gillen responded by saying he would send an agent to question Stewart and find out what he knew about the case. Gordon testified that he thought the statement was to be an offer of proof. Gordon also testified, however, that at the meeting Gillen never specifically discussed negotiating a plea other than to say that "obviously we are interested in people pleading guilty." After the meeting, Gillen sent Agent

Thompson to speak with Stewart. Agent Steed accompanied Thompson.

Steed testified that when he spoke with Stewart he was not aware that there had been a plea negotiation and that he understood the purpose of the interview was to determine whether Stewart had some information relevant to the investigation. He thought that they were speaking with Stewart with negotiation in mind, but was not aware of specific negotiations. Although Stewart testified that he was not read his *Miranda* rights, Agents Steed and Thompson testified otherwise.

At trial the court ruled as follows: "I find that the statement was freely and voluntarily made, that sufficient *Miranda* warnings were given and that under the decision in 706 F.2d 1198, it is without the scope of the 11(d)(6) [sic] exclusion." Stewart argues that because his statement was made during plea negotiations with law enforcement agents who were acting at the express direction of government attorneys, F.R.Crim.P. 11(e)(6) is applicable. We disagree.

This issue was thoroughly examined by the Eighth Circuit in *United States v. Rachlin,* 723 F.2d 1373 (8th Cir.1983). We find, as did the trial court, that F.R.Crim.P. 11(e)(6)(D) is not applicable in the instant case.

Next, Stewart argues that if the statement is not excludable under Rule 11, it should be excluded because it was involuntary. Viewing the totality of the circumstances the test is whether the statement was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). *See* also *United States v. Davidson,* 768 F.2d 1266, 1267 (11th Cir.1985). Having reviewed the totality of the circumstances, we find no evidence to indicate that the statement was not voluntary.

---

**5.** Stewart made his statement to Agent Steed of the Bureau of Alcohol, Firearms and Tobacco and Agent Thompson of the Drug Enforcement Administration.

■ Stewart further argues that the statement should have been excluded because it resulted from ineffective assistance and advice of counsel.

Tracking the *Rachlin* case, Stewart asserts that his attorney breached his duty to prepare adequately by totally failing to investigate the extent of the government's evidence before advising or seeking cooperation of his client. In addition, he argues that counsel should have, at the very least, had a firm understanding with the government as to the terms of any plea bargaining before allowing his client to make a statement. Finally, he argues that due to the 1979 amendment to Rule 11(e)(6), counsel should have required any "proffer" to be made to a government attorney or a clear manifestation from the government attorney that another would act in his place.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established the test under which claims of ineffective assistance of counsel are to be reviewed. First, a convicted defendant must show that his counsel's performance was deficient. Second, the convicted defendant must show that the deficient performance prejudiced his defense. · Stewart has not met the burden of proof under either prong of the *Strickland* case.

### V.(d)

### LITSKY STATEMENT

■ Defendants Bonadonna and Lombardi contend that the trial court's failure to exclude the testimony of government witness Bruce Litsky is reversible error because Litsky entered into a "contingent plea agreement" with the government. We disagree.

Litsky negotiated two separate agreements with the government. Litsky's first plea agreement was executed on January 11, 1983, and provided, in part, as follows:

The United States Government will make known to any sentencing court, or parole board, the nature and extent of Mr. Litsky's cooperation and its value to the Government ... [T]he recommendation of the government concerning [Litsky's] incarceration at time of sentencing may be less than five (5) years based upon a subjective evaluation by the Government of the nature and scope of Mr. Litsky's cooperation.

In addition, the agreement required Litsky's "full and truthful testimony" and that he not engage in further criminal conduct. Moreover, the agreement contained a proviso that if he committed perjury or made any false statements to the government, the agreement would be null and void and all his statements could be used against him. The other agreement contained similar language.

During the seventh week of trial, counsel for defendants collectively moved to exclude Litsky's testimony based upon the rationale of *United States v. Waterman,* 732 F.2d 1527 (8th Cir.1984) (28 U.S.C. § 2255 appeal), vacated en banc, No. 83–2159 (September 26, 1984) (affirming the judgment of the district court by an equally divided court), cert. denied, — U.S. —, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). In *Waterman,* the Eighth Circuit held that the government's promise to recommend a reduced sentence for the informant if the informant's cooperation in the form of truthful testimony led to further indictments, violated the defendant's right to due process and a fair trial.

Based on *Waterman,* the district court granted the defendant's motion and excluded Litsky's testimony. As noted above, *Waterman* was subsequently reconsidered, en banc and vacated. Thereafter, counsel for the government motioned for reconsideration. The trial court reversed its position and permitted the government to call Litsky as a witness.

Bonadonna and Lombardi contend the trial court's ruling was erroneous. The Eleventh and Fifth Circuits have considered similar plea agreements and it would serve no purpose to further elaborate in this opinion. The citation of these cases will suffice. *United States v. Valle-Ferrer,* 739 F.2d 545 (11th Cir.1984); *United States*

*v. Walker*, 720 F.2d 1527 (11th Cir.1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984); *United States v. Gary*, 626 F.2d 494 (5th Cir.1980), cert. denied, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981). The rationale of these cases is applicable here in that the distinguishing factor between the case at hand and the above cited cases is merely a mode of payment. In each situation the witness expects favorable treatment in exchange for his or her testimony. *See also* the case of *United States v. Kimble*, 719 F.2d 1253 (5th Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), in which the court held that the specifics of the agreement went to the weight of the testimony and not its admissibility.

### V.(e)

Lombardi argues that the testimony of government witness Bruce Litsky pertained to an unrelated marijuana conspiracy and hence the trial court erroneously failed to exclude it from evidence.

■■■ At trial, over defense counsel's continued objections, Litsky was permitted to testify concerning twelve incidents which dealt with a conspiracy to smuggle marijuana. The twelve incidents were specifically set forth in defense counsel's motion for mistrial. After hearing arguments from both sides the trial court denied the motion.

■■■ It is a unique function of the district court to determine the admissibility of evidence and, thus, admission of evidence is committed to the sound discretion of the trial court. *United States v. Duff*, 707 F.2d 1315, 1318–19 (11th Cir.1983). In reviewing challenges concerning the admissibility of evidence, this court will not disturb the trial court's determination absent a clear showing of abuse of discretion. *United States v. Russell*, 703 F.2d 1243 (11th Cir.1983).

The district court found that ten of the incidents, "perilously close to crossing the line" as to the marijuana conspiracy, were in fact admissible and relevant to the co-caine conspiracy. We find no abuse of discretion.

■■■ The other two areas of concern pertain to Litsky's testimony of Lombardi's use of an alias and the discussion of coordinates to a landing strip in South America. The court specifically instructed the jury that the testimony concerning these points was withdrawn and that it should not be considered. The general rule of this court is that evidence withdrawn from the jury with directions to disregard it does not constitute reversible error unless it is so prejudicial that it is incurable. Such a level of prejudicial effect exists where there is "a significant possibility ... that ... the stricken statement had a substantial impact upon the verdict of the jury." *United States v. Slocum*, 708 F.2d 587, 598 (11th Cir.1983). Here, we cannot say that the mention of Lombardi's use of an alias and the discussion of landing strip coordinates in South America had a substantial impact on the jury in the light of prior testimony which indicated his involvement in the importation of large loads of cocaine into Georgia, Tennessee and Pennsylvania. We find no error.

### V.(f)

Rose Marie Junker argues that the trial court erred in not granting her motion for mistrial based on her assertion that the government improperly introduced evidence of her silence after her arrest. The statements complained of occurred when DEA Agent George testified concerning the events which transpired after the Junkers' arrest. We set forth the statements complained of in the context in which they occurred at trial as follows:

"Q. After that reading of the rights did you have the occasion to conduct an interview of Mr. Junker?

A. Yes.

Q. Where was this interview conducted?

A. It was conducted at the D.E.A. office in Fort Lauderdale, Florida, in the processing room where we had fingerprinted and photographed both Junkers.

Q. Who was present during this interview?

A. Myself, Special Agent Anthony Cammarato and Special Agent Mike Garland was present.

Q. And Mr. and Mrs. Junker?

A. Both, yes.

Q. If you will, tell the court and jury about the interview you conducted.

A. I asked—both of the defendants were seated approximately two to three feet across from each other facing each other.

Mr. Manchell: Your Honor, at this point I would like to ask a question. Yesterday outside the presence of the jury we heard that the statement was only going to be offered against Joseph Junker, that's what the government offered. I would like those questions to be directed to find out what Joseph Junker said rather than what might have been said in anyone else's presence. I believe that my client could simply be sitting there, but it doesn't involve her. She has not adopted those statements, and the government has not alleging [sic] she adopted those statements.

Mr. Wisebram: Your Honor, we do offer the statement only against Mr. Junker, and I'm sure the court is going to so charge the jury. But I think Mr. Junker's behavior in relation to Ms. Junker in the room is very important. The court has heard part of that yesterday.

The Court: All right, you may under those circumstances go into it.

Ladies and Gentlemen, you should understand that the statement about this witness as to what Mr. Junker said, and Mr. Junker's statement, will be admitted solely and exclusively for the purpose of your consideration against Mr. Junker. You may not consider the statement of Mr. Junker as to the guilt or innocence of any other defendant. It's admitted solely and exclusively for the purpose of illustrating the guilt or innocence of Mr. Junker and for no other purpose.

Mr. Wisebram: Thank you, Your Honor.

By Mr. Wisebram:

Q. Agent Georges, did you have occasion to address questions to Mr. Junker?

A. Yes, sir.

Q. If you will, tell the court and jury exactly what you asked him and what his answers were?

A. I asked Mr. Junker if he owned the 1983 white Chevrolet Florida Registration YDS-860? He said he did not. Prior to answering, he stared at his wife. His wife stared at him. She didn't answer. He did. I then asked him who owned the vehicle? He said a friend of his named Steve Conti. I asked him to provide me the name, address, telephone number and a physical description of Mr. Conti.

Joseph Junker again stared at his wife, Rosemarie—

Mr. Manchell: Your Honor, again I would like to address the court outside the presence of the jury.

The Court: Ladies and gentlemen of the jury, let me ask you to retire to the jury room, please. (Whereupon, the jury retired from the courtroom, after which the following proceedings were had.)

Mr. Manchell: Your Honor, at this point I would like to ask for a mistrial. I think the comments of Agent Georges definitely reflect on my client, Rose Marie Junker, exercising her right to remain silent. It violates Doyle versus Ohio, and I believe they solicited the question twice from him that Joe Junker stared at her and looked at her, and the question was addressed to both of them is what his testimony was, and that she failed to respond to it, and that he chose to respond.

I believe that testimony going to the jury, no matter what the court has stated to the jury, is a reflection on her failure to make a comment either to correct or add to what Joe Junker said. I believe it violates her Fifth Amendment right. On that basis I would ask for a mistrial.

The Court: All right, the motion is denied. Bring in the jury."

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that it was fundamentally unfair to simultaneously afford a suspect a constitutional right to silence following arrest and yet allow the implications of that silence to be used against him. A comment is deemed to be a reference to a defendant's silence if either: (1) it was the prosecutor's manifest intention to refer to the defendant's silence; or, (2) the remark was of such a character that the jury would "naturally and necessarily" take it to be a comment on defendant's silence. *United States v. Shaw*, 701 F.2d 367 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). The court must consider the intent of the prosecutor and the character of the remarks in the context in which they occur. *United States v. Forrest*, 620 F.2d 446 (5th Cir.1980). The burden of proving such intent is on the defendant. *United States v. Austin*, 585 F.2d 1271 (5th Cir.1978). The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation. 701 F.2d at 382.

Agent George's testimony, that prior to answering the questions Mr. Junker stared at his wife, is clearly not a comment on Mrs. Junker's right to remain silent. This evidence was relevant to show Mr. Junker's state of mind and behavior during the course of the interview. When the above testimony is viewed in the context in which it was given, we cannot hold that it was the prosecutor's manifest intention to comment on Mrs. Junker's silence or that the jury would "naturally and necessarily" construe the evidence as a comment on Mrs. Junker's silence. We find no error in the Court's denial of defendant Rosemarie Junker's motion for a mistrial.

### V.(g)
### CHANGED THEORY

Lombardi complains that the prosecution changed or modified its theory of his role in the charged conspiracy during the course of the trial and thereby violated his Fifth Amendment right to due process and fundamental fairness. This argument is based on the fact that during opening statements the prosecutor stated the evidence would show that Lombardi delivered Canadian money to Miami to pay for a cocaine shipment; and, that in closing arguments the prosecutor argued that the evidence showed that the money was used to purchase a boat for use in Harold Rosenthal's escape.

Lombardi argues that the above variation constitutes a change in theory which severely prejudiced his defense. We find no merit in this argument.

### V.(h)
### MISIDENTIFICATION

Dunleavy contends that the misidentification of him as Harold Rosenthal was left uncorrected by government counsel causing him substantial prejudice which deprived him of due process of law and a fair trial. We disagree.

The misidentification of Dunleavy occurred as follows: DEA Agent Leonard was testifying about a flight he and government informant Shipp made to South America to pick up a load of cocaine. During this testimony, Agent Leonard was asked to identify the individual he saw while the plane was on the ground in Colombia. Agent Leonard responded by pointing out Dunleavy when actually the man they saw was Rosenthal. We are of the opinion that the misidentification did not go uncorrected.

During cross-examination Leonard testified that Shipp had told him that the person they would be meeting when the plane landed in Colombia was Harold Rosenthal. In addition, during re-direct examination, Agent Leonard testified that Shipp specifically told him that the gentleman they met on the ground was, in fact, Harold Rosenthal. Furthermore, Dunleavy asked for a curative instruction requesting that the jury be informed of the misidentification. The trial court proposed a modified instruction and counsel for Dunleavy stated that the changes were acceptable to him. The

next day, government counsel addressed the jury and made the following statement:

"Mr. Gillen: Ladies and Gentlemen of the Jury, during the testimony of Agent Leonard he identified the individual that he saw in the plane down in the Republic of Colombia on February the 11th, 1983, as Robert Dunleavy.

I state to you now that it is not the theory of the case of the United States that Robert Dunleavy was on that aircraft on February the 11th, 1983, nor is it the theory of the United States that Robert Dunleavy was in the Republic of Colombia on that day."

The above instruction is substantially similar to the one proposed by the court and approved by Dunleavy. Although the above instruction did not specifically state that a mistake had been made, we are of the opinion that the misidentification was not left uncorrected to the prejudice of Dunleavy.

### V.(i)

Rosenthal, Bonadonna, Watson and Dunleavy complain that the trial court improperly admitted evidence concerning the following: (1) Rosenthal's attempted escape from the Miami Correctional Center in October and November of 1983; (2) letters, documents and other writings seized from Rosenthal's prison cell in January 1984; and, (3) Rosenthal's attempted escape from the Atlanta penitentiary in August 1984.

Rosenthal, Bonadonna and Watson contend that Rosenthal's arrest and cooperation with DEA authorities constitutes affirmative action to withdraw from the conspiracy and therefore, subsequent acts should not have been admitted. We disagree.

■■■ Rosenthal's arrest did not automatically trigger his withdrawal from the conspiracy. One joining an unlawful scheme continues to be responsible until he does some unequivocal act to disavow or defeat the purpose of the scheme. Absent

that, he may not claim withdrawal. The burden of proof is on him who claims withdrawal. *United States v. Bradsby*, 628 F.2d 901, 905 (5th Cir. Unit A 1980).

■■■ Although Rosenthal spoke with DEA Agent Charette about his involvement in the conspiracy, there is ample evidence that Rosenthal was still actively engaged in the drug smuggling operation and hence, we cannot view his action as an attempt to defeat or disavow the purpose of the conspiracy.

Regarding the evidence seized from Rosenthal's prison cell, the trial court specifically reviewed the evidence in question pursuant to *United States v. James*, 590 F.2d 575 (5th Cir.1979), and found that it complied with all of the requisite requirements. The trial court's determination is a finding of fact which we do not find clearly erroneous. *United States v. Bulman*, 667 F.2d 1374, 1379 (11th Cir.1982).

### V.(j)

### LACK OF CONFRONTATION

Stewart argues that the admission of a tape recording between Stewart and a government informant and the admission of Russell Zoellner, Jr.'s testimony violated his Sixth Amendment right to confrontation. In addition, Rosenthal challenges the admission of government informer Loy Shipp's statements and statements of co-conspirators, Alaimo, Wahl[6] and Bonadonna, admitted during the testimony of DEA Agent Thomas Thompson.

■■■ The tape recording of the conversation between Stewart and government informant Jones was offered by the government as Stewart's adoptive admissions pursuant to Fed.R.Evid. 801(d)(2)(B). Any of Jones' statements which were not adopted by Stewart, the government argued, were used for the purpose of showing the context of Stewart's own statements. Prior to the presentation of the tape to the jury, the trial court carefully instructed the jury in this regard.[7] We

---

**6.** Alaimo and Wahl were not on trial in the instant case.

**7.** The Court's instruction was as follows:

find no error. *See United States v. Murray*, 618 F.2d 892, 900 (2d Cir.1980).

■ Stewart next complains that the statements of Russell Zoellner, Jr., admitted as statements of a co-conspirator in accordance with Fed.R.Evid. 801(d)(2)(E), deprived him of a fair trial for the following reasons: (1) The statements were not based on personal knowledge; (2) the statements were not made in the furtherance of the conspiracy; and (3) there was no showing that the declarant was unavailable.

The testimony complained of is the following: (1) Russell Zoellner, Jr. testified that on November 19, 1982, he saw his father, Russell Zoellner, Sr., give Stewart seven thousand, five hundred dollars. Zoellner, Jr. testified that his father stated that the money was a half payment for a previous trip that Zoellner, Sr. and Stewart made to South America to fly cocaine into the United States; Zoellner, Jr. also testified about a trip he made to Florida with Stewart in order to purchase a bladder for an aircraft, and about a flight he and Stewart made from West End, Bahamas, which had to be aborted due to fuel line problems.

Prior to Zoellner, Jr.'s testifying before the jury, the court conducted a hearing in which Zoellner, Jr. was questioned to determine whether the statement regarding the payment of $7,500 was in furtherance of the conspiracy. On that ground, the court ruled that the testimony was admissible. In *United States v. Peaden*, 727 F.2d 1493 (11th Cir.1984), this court held that determinations of the admissibility of evidence rests largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of discretion. We find no error.

■ The other testimony complained of by Stewart occurred during Stewart's counsel's cross-examination of Zoellner, Jr. Acceptance of Stewart's argument would circumvent our entire judicial system to allow one to elicit testimony at trial and later allow that person to complain of its admissibility on appeal.

■ We next address Rosenthal's challenge to DEA Agent Thompson's testimony. Rosenthal complains of the following statements:

(a) In a meeting between Alaimo, Bonadonna, government informer Shipp and Thompson, Bonadonna stated that he wanted Shipp to tell Harold that "The Fatman is ready.";

(b) Bonadonna's statement to Thompson that it was Rosenthal who dealt with the Colombians directly and that the hard work, more or less, was done by Rosenthal;

(c) Wahl's statement that Rosenthal wanted to return to Colombia immediately (after a recent arrest) and that Rosenthal was too smart to be dealing with the "stupid people" arrested;

(d) Shipp asked her what pilots Rosenthal was using and Wahl mentioned specific individuals;

(e) Wahl's comments that she felt, as did Rosenthal, that it was dangerous in the Bahamas and that they both wanted to return to Colombia as soon as possible; and

(f) Wahl's statement that she was happy that Rosenthal was dealing with Thompson and Shipp rather than his former associates.

"... insofar as the statements by Mr. Jones on the tape, or the conversations or the words from Mr. Jones, you may not consider that statement or Mr. Jones' statement unless you consider or unless you determine that Mr. Jones' statements have been adopted by Mr. Stewart.

Then you may consider Mr. Jones' statements against Mr. Stewart only.

That is, I repeat, there's nothing on this tape that can be considered against any other defendant than Mr. Stewart and you can only consider those statements which Jones makes if you determine from your examination of the tape and transcript that Mr. Stewart adopted the statements of Mr. Jones.

If Mr. Stewart did not adopt the statements of Mr. Jones, the statements would be admissible only, the statements of Mr. Jones would be admissible only for the limited purpose of showing the context of the tape and the defendant's own statement, and for no other purpose."

The government argues that these statements were admitted solely to explain conduct, and as adoptive admissions pursuant to Rule 801(d)(2)(B). Although should we find that the statements do not comply with the above exceptions to the hearsay rule, even if they were improperly admitted, the overwhelming evidence against Rosenthal lead us to the conclusion that the error was harmless beyond a reasonable doubt. *See United States v. Phillips,* 664 F.2d 971, 1027 n. 84 (5th Cir. Unit B. 1981).

### VI.(a)
### JURY CHARGES AND POST VERDICT RULING

Dunleavy alleges that the trial court committed error by not charging the jury in accordance with the Seventh Circuit standard for a violation of Title 18 § 1952 of the Travel Act. *United States v. Zomater,* 501 F.2d 540 (7th Cir.1974). The appellant admits that the instruction given by the trial court did comply with the Fifth Circuit case of *U.S. v. Jones,* 642 F.2d 909 (5th Cir.1981). The *Jones* case was approved by this court in *U.S. v. Griffin,* 699 F.2d 1102 (11th Cir.1983).

In addition, Dunleavy contends the trial court erred by refusing to give his requested alibi instruction to the jury. We have reviewed the alibi instruction given by the court and can find no error. The trial court was not required to "recite the jury instructions in the precise language requested by a defendant" as long as the charge adequately addresses the substance of the defendant's request. *United States v. Silverman,* 745 F.2d 1386, 1396 (11th Cir.1984).

### VI.(b)

Rosenthal argues that the trial court erred by imposing a sentence on Counts Nine, Ten, Eleven, Thirteen, Fourteen, Fifteen, Sixteen, Eighteen, Nineteen and Twenty in light of his conviction and sentence on Count Three. As previously stated, Counts Nine, Ten, Eleven, Fourteen and Fifteen charged Rosenthal and others with the importation of cocaine in violation of 21 U.S.C. § 952; Count Thirteen charged Rosenthal and others with conspiring to import cocaine in violation of 21 U.S.C. § 963; and, Counts Sixteen, Eighteen, Nineteen and Twenty charged Rosenthal and others with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Count Three charged Rosenthal with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848.

 Counts Nine, Ten, Eleven, Fourteen, Fifteen, Sixteen, Eighteen, Nineteen and Twenty, allege violations of substantive criminal statutes which are alleged as predicate acts of the 21 U.S.C. 848 violation. Citing *United States v. Middleton,* 673 F.2d 31 (1st Cir.1982) and *United States v. Stricklin,* 591 F.2d 1112 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).

Rosenthal argues in brief that "substantive acts also constitute lesser included offenses of 21 U.S.C. § 848 where such substantive offenses could have served as predicate acts for the § 848 verdict." Hence, he argues he was punished for lesser included offenses. We disagree.

The Supreme Court found in *Garrett v. United States,* —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), that Congress intended the CCE provision to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses, which must be shown to make out a CCE violation.

 Regarding Count Thirteen, it is the law of this circuit that conspiracy offenses merge with a § 848 offense. *United States v. Harrington,* 761 F.2d 1482, 1487 (11th Cir.1985). Hence, Rosenthal's conviction and sentence on Count Thirteen must be vacated.[8]

---

**8.** Rosenthal was sentenced as follows: On each of Counts One and Two, 20 years imprisonment and a $25,000 fine. On Count Three, life imprisonment and a $100,000 fine. The sentence imposed in Counts One, Two and Three are to run concurrently. On each of Counts Nine, Ten, Eleven, Twelve, Fourteen and Fifteen, 15 years imprisonment and $25,000 fine, to run concurrent and to follow the sentence imposed in Counts One and Two. On Count Thirteen,

## VII.

### WILSON'S ACQUITTAL

The government argues that there was sufficient evidence to support Wilson's conviction for conspiracy to violate 18 U.S.C. § 1962(c) and hence the district court erred in granting Wilson's motion for judgment of acquittal.

 Wilson was indicted and charged with violating § 1962(c) and (d) as well as substantive drug violations and interstate transportation in aid of racketeering. On October 26, 1984, Wilson was convicted on Count One of the indictment charging RICO conspiracy. On November 1, 1984, District Court Judge Robert H. Hall ordered the time within which Wilson could file his motion for judgment of acquittal, pursuant to Rule 29(c) F.R.Crim.P., be extended through and including November 12, 1984. On November 11, 1984, Wilson requested an additional extension from the court. On November 12, 1984, Wilson's counsel received a telephone call verifying that the extension was granted, allowing Wilson until November 16, 1984, to file his motion.

The government argues that although the first extension was permissible because it was made within seven days following the conviction, the trial court was without jurisdiction to further extend the time for filing the motion after the seven day period expired. We do not squarely address this issue.

 After reviewing the evidence in the light most favorable to the government, we find no merit to the government's contention that the trial court erred in granting Wilson's motion for judgment of acquittal. Furthermore, the district court, having heard nine weeks of testimony, was in a far better position to determine whether there was sufficient evidence to convict Wilson than this appellate court one and one-half years later, and we find no evidence which compels us to alter his decision.

Therefore, if the granting of the second extension be error, it is error without injury.

AFFIRMED in part and REVERSED in part.

fifteen years imprisonment and $25,000 fine to run concurrent with the sentence imposed in Counts One and Two. On each of Counts Sixteen, Eighteen, Nineteen and Twenty, fifteen years imprisonment and $25,000 to run concurrently with the sentence imposed in Counts Nine, Ten, Eleven, Twelve, Fourteen and Fifteen. All sentences, except the sentence imposed in Count Three are to follow the federal sentence Rosenthal is currently serving. Rosenthal has a special parole term of ten years on each of Counts Nine, Ten, Eleven, Twelve, Fourteen, Sixteen, Eighteen, Nineteen and Twenty to run concurrently.

Because Rosenthal's § 963 sentence runs concurrently with the sentence imposed for his § 848 violation, vacating his § 963 sentence does not reduce his total sentence.