**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carmen Rosa BEHETY, Felino Ramirez–**
**Valdez, Defendants–Appellants.**

No. 92–4290.

United States Court of Appeals,
Eleventh Circuit.

Sept. 16, 1994.

Pamela I. Perry, Bierman, Shohat, Loewy & Perry, P.A., Miami, FL, for Felino Ramirez–Valdez.

Arthur Joel Berger, Miami, FL, for Carmen Rosa Behety.

Lisa A. Hirsch, Linda C. Hertz, Harriett R. Galvin, Asst. U.S. Attys., Miami, FL, for appellee.

Before COX and CARNES, Circuit Judges, and WOOD,* Senior Circuit Judge.

COX, Circuit Judge:

Carmen Rosa Behety and Felino Ramirez–Valdez ("appellants") appeal their convictions of various drug offenses. We affirm.

* Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Yanes and Roberto Jesus Valido were originally indicted along with Behety and Ramirez–Valdez. After trial commenced, Yanes pled guilty to both

## I. FACTS AND PROCEDURAL HISTORY

The appellants were recruited by Jose Yanes[1] to participate in a scheme to import cocaine from Guatemala to Florida. In March 1991, Yanes purchased a pleasure yacht named the *GHOST*. Yanes testified that Columbians had forwarded him the money to purchase the *GHOST*. Yanes registered the *GHOST* in Florida under the names Jose Ramos and Christopher Calorussa. Neither Ramos nor Calorussa had an ownership interest in the *GHOST*, but Yanes wanted it to appear as if the vessel was owned by Americans.

In Key Largo, Florida, Yanes had the *GHOST* equipped with secret compartments for the storage of cocaine. Yanes then recruited Roberto Jesus Valido, Behety and Ramirez–Valdez for the importation of cocaine from Guatemala to Florida. Valido was to captain the vessel and Ramirez–Valdez was to serve as mechanic. Yanes hired Behety to give the appearance the crew was a group of tourists on a pleasure trip. Yanes promised Ramirez–Valdez $100,000 in cocaine and Behety $50,000 for their participation in the scheme.

The *GHOST* then made a test run to the Bimini Islands. When the *GHOST* was returning from Bimini, United States Customs officials stopped and boarded the vessel. Valido, Behety and another woman were on board at the time. The officials did not find the secret compartment while doing a general search of the vessel.

After the test run, Yanes flew to Delaware and re-registered the vessel, this time listing appellants as its owners. Both appellants knew their names were to be used by Yanes. Yanes felt it would be less suspicious if it appeared the owners of the vessel were on board when they sailed to Guatemala. Delaware was chosen by Yanes because a notarized bill of sale was all that was required for

counts and agreed to testify on behalf of the Government. Valido was tried with Behety and Ramirez–Valdez, but failed to appear on the last day of trial and was convicted on both counts in absentia.

registration. The Delaware authorities assigned the *GHOST* a registration number and hull identification number of DL8582N.

After the *GHOST* underwent some repair work, Valido and the appellants departed Key West, Florida for Guatemala. Yanes and his girlfriend flew to Guatemala to rendezvous with the crew of the *GHOST* at the Hotel Tropical Izabal on Lake Izabal.[2] The *GHOST* cleared customs in Livingston, Guatemala, then sailed upriver to Lake Izabal where it docked at the Hotel Tropical Izabal.

On May 20, 1991, the appellants, Valido, Yanes, and his girlfriend boarded the *GHOST* and departed the docks of the Hotel to locate another vessel and crew on Lake Izabal who were to provide the cocaine. Apparently the first attempt to locate the vessel was unsuccessful as the same individuals boarded the *GHOST* and made another attempt on May 21, 1991. This time, the crew met with success and the cocaine was loaded aboard the *GHOST* and stored in the secret compartment.

Unknown to the appellants, Valido, or Yanes, in April a Customs agent in Florida had received information that the *GHOST* was going to Central America to pick up cocaine. The agent established surveillance on the vessel when it was in Key Largo and later when it was in Key West. Customs officials also intercepted and recorded several radio transmissions made between crew members of the *GHOST* and crew members of the other vessel on May 20th and 21st. Also, on May 18, 1991, a DEA agent stationed in Guatemala received information about smuggling plans involving the *GHOST.* Agent Von Bresen contacted Guatemalan military intelligence and related that the *GHOST* had arrived in Guatemala from Florida with three American crew members who were planning to pick up cocaine on Lake Izabal. That same day, Lieutenant Federico Fuentes–Aragon, an officer in the Guatemalan Navy in Puerto Barrios, received information from the Guatemalan intelligence service that a vessel with three Americans who were planning to smuggle cocaine was to

arrive at the port in Livingston. Fuentes–Aragon ran a check but was unable to locate a vessel fitting this description. The next day, Fuentes–Aragon learned that the vessel had arrived in the port of Livingston. On May 21, after learning of the *GHOST*'s name and plans to pick up cocaine on Lake Izabal, Fuentes–Aragon's superiors ordered him to stop and search the vessel if it attempted to leave the area. Fuentes–Aragon located the *GHOST* at the Hotel Tropical Izabal on May 22, 1991, and placed it under surveillance.

On May 26, 1991, as the *GHOST* was departing the hotel, a patrol boat of the Guatemalan Navy, acting on Fuentes–Aragon's orders, stopped and boarded the *GHOST.* Aboard the *GHOST* were Valido and the appellants. Yanes and his girlfriend had returned to the United States earlier by air.

An officer and sailors of the Guatemalan Navy boarded the *GHOST* and requested the vessel's documentation. Valido complied with the request and handed over the *GHOST*'s documentation. Fuentes–Aragon then boarded the vessel and after an initial search, located a container of sodium bicarbonate, a product frequently used to mask the odor of cocaine and other drugs. He also noticed that a portion of the vessel had been recently painted. Fuentes–Aragon decided to take the vessel to a naval base for a more thorough inspection.

At the naval base in Puerto Barrios, a naval team searched the *GHOST* the evening of May 26th and the morning of May 27th. During the search, the team discovered the false compartment and recovered 343 kilograms of cocaine in the aft and bow sections of the vessel.

On the morning of May 27th, a Guatemalan military intelligence officer contacted DEA agent Von Bresen and requested he attend the search of the *GHOST.* That afternoon, agent Von Bresen and agent Shroyer arrived after the Guatemalan officials had already discovered cocaine in the vessel. Neither agent assisted with the search of the

---

**2.** Lake Izabal, i.e. Lago de Izabal, is a large natural lake in western Guatemala which is accessible by river from the Gulf of Honduras.

vessel, although they did videotape part of the search. The Guatemalans told Von Bresen that they wanted the appellants and Valido to be prosecuted in the United States. After clearing it with U.S. Customs officials, Von Bresen made the arrangements to transport Valido and the appellants to the United States and also took possession of the documents and cocaine seized during the search.

A federal grand jury in the Southern District of Florida returned a two count indictment against Valido, Behety, Ramirez–Valdez, and Yanes. Count One of the indictment charged possession with intent to distribute a controlled substance "while on board the vessel 'GHOST', a vessel of the United States," in violation of 46 U.S.C.App. § 1903(a), (g), and 18 U.S.C. § 2. Count Two of the indictment charged a conspiracy to possess with intent to distribute "while aboard the vessel 'GHOST', a vessel of the United States" in violation of 46 U.S.C.App. § 1903(j) & (g). Behety filed a motion, which Ramirez–Valdez joined, seeking to suppress the evidence seized during the search of the GHOST by the Guatemalan officials. Immediately prior to trial, the court held a suppression hearing and denied the motion. Following a jury trial, the appellants were convicted on both counts.

## II. ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES

On appeal, the appellants contend that the prosecutor and the court constructively amended the indictment by informing the jury that the appellants could be convicted if the appellants were citizens or resident aliens of the United States or on board a vessel subject to United States jurisdiction when the indictment charged only that they were on board a vessel of the United States.[3] In response, the Government maintains that any possible error was harmless as the jury instructions and arguments in their entirety

demonstrate that the jury had to determine that the appellants were aboard a vessel of the United States.

Next, the appellants argue that the court committed plain error by partially directing a verdict on the "vessel of the United States" element by telling the jury the GHOST was a vessel of the United States. In response the Government maintains the court misspoke and the instructions, when read in their entirety, make clear that the court intended the jury to independently determine whether the GHOST was a vessel of the United States.

The appellants also argue that the trial court erred in denying their motion to suppress as the search was subject to and violative of the Fourth Amendment. The Government counters that the court properly denied the motion to suppress as the search was not subject to the Fourth Amendment. Assuming arguendo that the search was subject to the Fourth Amendment, the Government insists that the search did not violate the Fourth Amendment.

Finally, the appellants challenge the court's jury instruction defining "vessel of the United States."[4] The appellants argue that the instruction was so vague as to require the jury to act arbitrarily in convicting them on this basis. The Government insists the instruction was not so vague as to constitute plain error.[5]

## III. DISCUSSION

### A. Constructive Amendment

The applicable statute makes it unlawful for any person "on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, or who is a United States citizen or a resident alien of the United States on board any vessel" to possess with intent to distribute a controlled

---

**3.** Behety's brief contains this argument and Ramirez–Valdez filed a motion, which we granted, adopting this argument.

**4.** Ramirez–Valdez's motion adopted this argument of Behety's also.

**5.** Additionally, Behety argues the evidence was insufficient and Ramirez–Valdez argues the court erred in failing to discharge him because the Government lacked jurisdiction under 46 U.S.C.App. § 1903. These arguments are meritless and do not warrant discussion. See 11th Cir.R. 36–1.

substance. 46 U.S.C.App. § 1903(a) (1988).[6] The indictment in this case, however, only alleges that the *GHOST* was a vessel of the United States and says nothing about the defendants' United States citizenship or resident alien status or the vessel being subject to the jurisdiction of the United States.

■■■ As this court has explained, "an amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Keller,* 916 F.2d 628, 634 (11th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991); *see United States v. Miller,* 471 U.S. 130, 138, 105 S.Ct. 1811, 1816, 85 L.Ed.2d 99 (1985). Convictions based on a modification of an essential element not charged by the grand jury present reversible error. *United States v. Artrip,* 942 F.2d 1568, 1570 (11th Cir.1991). Such modifications may occur either by the actions of the court or actions of the prosecutor. *United States v. Salinas,* 654 F.2d 319, 324 (5th Cir. Unit A Aug. 1981).[7] A court's jury instruction that constructively amends an indictment constitutes reversible error per se because the instruction violates a defendant's Fifth Amendment right to be tried only on charges presented by a grand jury and creates the possibility that the defendant may have been convicted on grounds that the indictment did not allege. *United States v. Weissman,* 899 F.2d 1111, 1114 (11th Cir. 1990).

During closing arguments, the prosecutor told the jury:

> Under the law as the Judge is going to tell you, not only it [sic] has to be a U.S. vessel by registration, but if you are a resident alien or a U.S. citizen, that invokes the jurisdiction under this statute.

Also, while summing up instructions on Count One, the court instructed the jury that "to prove a violation of [section 1903(a) ], the

Government must prove ... only that the defendants were on board a vessel subject to the jurisdiction of the United States or were citizens of the United States, and that while on board the vessel the defendants knowingly and intentionally possessed with intent to distribute cocaine."

■■■ The appellants contend the prosecutor and court constructively amended the indictment by allowing the jury to convict them based on the appellants' nationality or on the *GHOST*'s being "subject to the jurisdiction of the United States." The indictment charged only that the *GHOST* was a vessel of the United States and did not charge as a basis of conviction that a defendant was a United States citizen or resident alien or that the vessel was subject to the jurisdiction of the United States.

*United States v. Peel,* 837 F.2d 975 (11th Cir.1988), involved similar issues. Peel was charged with violating 21 U.S.C. § 955a(a), the predecessor to 46 U.S.C.App. § 1903(a), under which one could be convicted for possession with intent to distribute while being on board a United States vessel or a vessel subject to United States jurisdiction. The district court erroneously charged the jury that Peel could be convicted either if he was on board a United States vessel or if he was a United States citizen. Section 955a(a) did not include United States citizenship as a basis for conviction; 21 U.S.C. § 955a(b) based liability on United States citizenship, but the indictment had not alleged a violation of this statute. Our court reversed Peel's conviction because the court's jury instruction "permitted the jury to convict [Peel] of crimes not charged in the indictment." *Peel,* 837 F.2d at 977.

■■■ When considering an argument that an indictment was constructively amended, we are required to determine whether the prosecutor's actions or the court's instructions, "viewed in context," resulted in

---

6. 46 U.S.C.App. § 1903(b), defines "vessel of the United States" to include any vessel documented under federal law and any undocumented vessels issued a registration number by state authorities in the state in which the vessel principally is operated.

7. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the expansion of an indictment either literally or in effect. *See United States v. Andrews,* 850 F.2d 1557, 1559 (11th Cir.1988) (en banc) (requiring review of court's instructions "in context"); *Salinas,* 654 F.2d at 324 (explaining that the actions of a prosecutor or a court may constructively amend an indictment). The danger that we are concerned with is that a "defendant may have been convicted on a ground not alleged by the grand jury's indictment." *Peel,* 837 F.2d at 979 (quoting *United States v. Lignarolo,* 770 F.2d 971, 981 n. 15 (11th Cir.1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986)).

Initially, we conclude that there is no possibility that either appellant was convicted as a result of the court's instruction that a violation of section 1903(a) could be premised on a finding that the vessel was subject to United States jurisdiction. The Government did not argue that the *GHOST,* when stopped by Guatemalan authorities, was subject to United States jurisdiction. The court did not define the meaning of "subject to United States jurisdiction" for the jury. There was, of course, no evidence that the vessel was subject to the jurisdiction of the United States as defined by 46 U.S.C.App. § 1903(c)(1) as the vessel was stopped by Guatemalan authorities in Guatemalan waters. Accordingly, the jury could not have convicted the appellants on this unindicted basis. *See Peel,* 837 F.2d at 978 (finding support in the record for conviction on the unindicted offense); *see also United States v. Alvarez,* 972 F.2d 1000, 1003 (9th Cir.1992) (explaining that constructive amendment occurs when the evidence produced at trial supports a crime other than the crimes charged in the indictment); *United States v. Leichtnam,* 948 F.2d 370, 379 (7th Cir.1991) (finding support in the evidence for conviction of an unindicted offense); *United States v. Zingaro,* 858 F.2d 94, 99 (2d Cir.1988) (same). Therefore, only the prosecutor's and court's statements about nationality remain as a potential basis for conviction as the result of a constructive amendment of the indictment.

### 1. Prosecutor's Comment

Ramirez–Valdez's constructive amendment argument must succeed, if at all, on the single comment made by the prosecutor in closing arguments. This is ·because the court's jury charge did not mention status as a "resident alien" as a basis for conviction, although the undisputed evidence established that Ramirez–Valdez was a resident alien. When the prosecutor's closing argument is read in context, this aberrant statement was, at most, ambiguous and confusing. The Government's theory throughout the trial had been that the *GHOST* was a "vessel of the United States" and extensive testimony and evidence were devoted to proving this theory. *See Andrews,* 850 F.2d at 1559 (concluding that no constructive amendment occurred in part because the prosecution never pursued the theory that the defendant claimed to be the source of a constructive amendment). The prosecution introduced Ramirez–Valdez's green card, but did so without comment beyond its identification as Ramirez–Valdez's "green card." Similarly, Behety's passport was introduced into evidence at this time without comment from the prosecutor about Behety's United States citizenship. The prosecution did not argue or imply that this evidence satisfied an element of the charges against Ramirez–Valdez or Behety. The ambiguity or confusion that may have arisen in jurors' minds as a result of the prosecutor's comment is an insufficient basis upon which to conclude that a constructive amendment occurred. *See id.* at 1560 n. 8.

### 2. Court's Instruction [8]

Only Behety may claim that the court's instruction constructively amended the indictment since the court referred only to United States citizenship as a basis of conviction, and said nothing about resident alien status. The problem with Behety's argu-

---

**8.** The relevant portion of the court's jury instruction is:

In short, to prove a violation of the statute, the Government must prove beyond a reasonable doubt only that the defendants were on board a vessel subject to the jurisdiction of the United States or were citizens of the United States, and that while on board the vessel the defendants knowingly and intentionally possessed with intent to distribute cocaine.

R. 18 at 119.

ment that she may have been convicted because of her status as a United States citizen, and not because she was on board a vessel of the United States, is that we know that the jury found beyond a reasonable doubt that the *GHOST* was a vessel of the United States. We know this because that was the jury's only basis to convict Ramirez–Valdez. Evidence that the vessel was issued registration numbers by both Florida and Delaware authorities supports a finding that the *GHOST* was a "vessel of the United States" as defined by 1903(b). On the rather unusual circumstances presented by this case, therefore, we can conclude that the jury found Behety guilty of the specific charges in the indictment.

### B. Court's partial direction of verdict

■ Appellants contend the court partially directed a verdict against them while charging the jury by its statement that "[o]f course, the *GHOST* was a vessel of the United States." The appellants did not object to this instruction at trial and therefore we review only for plain error. *See* Fed. R.Crim.P. 52(b).

If we viewed the challenged statement in isolation, we might conclude that the court improperly foreclosed the jury's role in determining this issue. When the court's instructions are read as a whole, however, it is clear that this was a simple misstatement. This statement followed the court's charge on Count Two of the indictment in which the court apparently failed to mention the required finding that the *GHOST* was a vessel of the United States. The court's statement which the appellants challenge was meant to correct this omission rather than foreclose the jurors' role. While it is arguable the court should have premised this statement with an affirmative indication that this was an additional finding required, we conclude that the jury charge as a whole did not foreclose determination of this issue by the jury.

### C. Denial of Motion to Suppress

■ A district court's denial of a motion to suppress presents a mixed question of law and fact. *United States v. Ramos*, 933 F.2d 968, 972 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992). Appellants challenging the denial must demonstrate that the court's factual findings are clearly erroneous, *United States v. Nixon*, 918 F.2d 895, 902 (11th Cir.1990), but we review a district court's application of law to the facts de novo. *Ramos*, 933 F.2d at 972. When considering a ruling on a motion to suppress, all facts are construed in a light most favorable to the successful party. *United States v. Baron–Mantilla*, 743 F.2d 868, 870 (11th Cir.1984).

The district court denied the motion to suppress and then explained its decision in a well-reasoned and thoughtful analysis. We find no error in this analysis.

■ The Fourth Amendment is generally inapplicable to actions carried out by foreign officials in their own countries enforcing their own laws, even if American officials are present and cooperate in some degree. *United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *Government of Canal Zone v. Sierra*, 594 F.2d 60, 72 (5th Cir.1979). Evidence obtained by foreign police officials from searches conducted in their country is generally admissible in federal court regardless of whether the search complied with the Fourth Amendment. *Rosenthal*, 793 F.2d at 1230; *see United States v. Morrow*, 537 F.2d 120, 139 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). There are, however, two exceptions to this general rule.

■ The first exception is that if the conduct of the foreign officials during the search and seizure "shock[s] the judicial conscience," the evidence may be excluded. *Morrow*, 537 F.2d at 129 (quoting *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965)); *see Rosenthal*, 793 F.2d at 1230–31. The second exception is that the exclusionary rule may be invoked if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counter-

parts. *Rosenthal,* 793 F.2d at 1231. Some courts have described this exception as the joint venture doctrine, and explain that it requires that the participation of federal agents be so substantial so as to convert the search into a joint venture. *Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir. 1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *see also United States v. Verdugo–Urquidez,* 856 F.2d 1214, 1224–25 (9th Cir.1988) (discussing the development of the joint venture doctrine), *rev'd on other grounds,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); *Rosenthal,* 793 F.2d at 1231.[9]

 The appellants argue this latter exception is applicable due to the DEA agents' participation in the search of the *GHOST* and because, they contend, the Guatemalan officials were acting as agents for the DEA. Agent Von Bresen's communication to Guatemalan authorities regarding the *GHOST*'s arrival and plans to export cocaine is insufficient to bring the search within the exception. *See United States v. Hawkins,* 661 F.2d 436, 455–56 (5th Cir. Unit B 1981) (DEA's notification of Panamanian authorities regarding suspected crash of plane carrying cocaine insufficient to trigger Fourth Amendment protections), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *United States v. Heller,* 625 F.2d 594, 599–600 (5th Cir.1980) (tip from United States officials to British police regarding defendant insufficient to trigger Fourth Amendment); *Morrow,* 537 F.2d at 140 (communication between United States and Canadian law enforcement officials of name and number of informant insufficient to trigger exception to general rule of inapplicability). Similarly, the DEA agents' presence and even videotaping of the search does not con-stitute the level of participation this exception contemplates. *See Rosenthal,* 793 F.2d at 1231 (American agents' presence at search and seizure of defendant's residence insufficient to trigger exception); *Birdsell,* 346 F.2d at 782–83 (FBI agents' arrival and inspection hours after arrest insufficient participation to trigger Fourth Amendment rights). Therefore, we conclude the district court properly denied the appellants' motion to suppress.

### D. "Vessel of the United States" Instruction

 The appellants assert error in the court's instruction that "vessel of the United States" meant a vessel "documented under Chapter 121 of Title 46 or a vessel numbered as provided in Chapter 123 of that title." (R. 8–118). The appellants argue that this instruction was "gibberish" as the court did not instruct the jury on either of these chapters' provisions. We review this asserted error under the plain error standard as neither of the appellants objected to this instruction or requested supplemental instructions. *United States v. Solomon,* 856 F.2d 1572, 1575 (11th Cir.1988), *cert. denied,* 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989). Jury instructions will be reversed for plain error only if, " 'the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice,' or the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.' " *United States v. Pepe,* 747 F.2d 632, 675 (11th Cir.1984) (quoting *United States v. Thevis,* 665 F.2d 616, 645 (5th Cir. Unit B 1982)).

The court should have explained to the jury that "numbered as provided by Chapter 123" of Title 46 refers to a vessel being

---

9. *United States v. Morrow,* 537 F.2d 120, 140 (5th Cir.1976), suggests that the Ninth Circuit's articulation of the joint venture test for this exception requires less participation by American officials for its satisfaction than the test established by *Birdsell v. United States,* 346 F.2d 775, 782 (5th Cir.1965). *Birdsell* held that Fourth Amendment rights were not invoked in a foreign search even though American officials were present and "cooperated in some degree." 346 F.2d at 782. The court in *Morrow* also expressly refused to choose between what it saw as two different tests under the exception. 537 F.2d at 140. The court's discussion of the exception in *Rosenthal* did not contemplate different tests. *See* 793 F.2d at 1231. Instead, the court cited to *Stonehill* without recognition of *Morrow's* reservation. *Id.* For purposes of this opinion we are not required to resolve this potential dispute as we conclude, as the court in *Morrow* did, that under either test, the agents' participation was not sufficiently material to invoke the appellants' Fourth Amendment rights.

**512**

numbered by a state which has a numbering system approved by the Secretary of Transportation. *See* 46 U.S.C. § 12301(a) (1988). The court then should have judicially noticed that both Florida and Delaware have numbering systems approved by the Secretary of Transportation. *See* 33 C.F.R. 173, App. A (1992).

While the court's instruction was vague and incomplete, there was extensive testimony and evidence concerning registration of the *GHOST* in Florida and Delaware. Because this uncontradicted evidence established that the *GHOST* was a vessel of the United States, the error did not result in a miscarriage of justice.

### *IV. CONCLUSION*

The appellants' convictions and sentences are affirmed.

AFFIRMED.