[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 29, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-10126
Non-Argument Calendar

_____

D. C. Docket No. 04-00033-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHAWN LOUIS GOODMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 29, 2005)**

Before BIRCH, BARKETT and FAY, Circuit Judges.

PER CURIAM:

Shawn Louis Goodman appeals his conviction and 112-month sentence for bank robbery in violation of 18 U.S.C. § 2113(a). He argues on appeal that the district court (1) erred by finding that he knowingly and voluntarily waived his <u>Miranda</u> rights, and (2) plainly erred by sentencing him under the formerly mandatory Federal Sentencing Guidelines. For the reasons stated more fully below, we affirm.

Goodman pled not guilty to one count of bank robbery and proceeded to trial. Prior to trial, Goodman filed a motion to suppress statements made to federal and state law enforcement agents and requested a hearing to determine whether or not the statements were made voluntarily and not in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 458-71, 86 S.Ct. 1602, 1619-26, 16 L.Ed.2d 694 (1966).

The district court conducted a hearing, and first heard testimony from Plaquemine, Louisiana[1] Police Officer Christopher Joffrion, who was present at the time of Goodman's arrest. Joffrion testified that Goodman was arrested after a traffic stop based on a "Be-On-The-Lookout" flier issued by the Federal Bureau of Investigation ("FBI"). Goodman was then placed in the back of a police car and another officer on the scene read Goodman his <u>Miranda</u> rights off the back of a card. Next, Goodman was taken to the police station booking room where Joffrion

_____

[1] The robbery in this case took place in Georgia, but Goodman fled and was arrested by the Plaquemine, Louisiana police department.

2

reread Goodman his Miranda rights, this time off of a typed form. Joffrion testified that Goodman appeared to understand his rights and was given an opportunity to read and review the sheet, which he signed.

However, the sheet itself contained an ambiguity in the section marked "Waiver." That section contained two questions, the first being, "Do you understand each of the rights I have explained to you," which on the form was marked "Yes," and the second being, "Having been read these rights, do you wish to make a statement to us now," which on the form was marked both "Yes" and "No." Joffrion was asked about the inconsistent marks and explained that, at the time Joffrion asked the second question (whether Goodman wished to make a statement) Goodman initially said no, prompting Joffrion to mark "no" on the form. However, as Joffrion continued to gather information, Goodman said "Whatever. You got me," and proceeded to voluntarily give information about how long he had been running and where he had been, prompting Joffrion to mark the "yes" box on the form. Joffrion further testified that, before he had checked "yes" on the form, he had confirmed that Goodman wanted to talk to him. Joffrion indicated that he had made no promises to Goodman, stating only that whatever Goodman wanted to say, Joffrion was there to listen, and that it took only a few seconds from the time Joffrion had first marked "no" on the form for Goodman to

3

begin volunteering information.

Nonetheless, Joffrion did not begin questioning Goodman at that time because his supervisor informed Joffrion to wait for the FBI to arrive. When asked why Goodman was Mirandized if there were no intention of interrogating him, Joffrion responded that it was a routine policy and procedure to Mirandize all suspects under arrest. Joffrion testified that Goodman was booked and read his rights at approximately 3:30 p.m., the FBI did not arrive until between 5:45 p.m. and 6:00 p.m., and during the interim period, Goodman was issued several cigarette breaks as well as given a hot dog and cold drink. At no time did Goodman request a lawyer or appear under the influence of drugs or alcohol.

On cross-examination, Joffrion admitted that, when a discrepancy appears and both a "yes" and "no" box are checked on the same Miranda form, the suspect's intent is not entirely clear. However, Joffrion further admitted that, when Goodman was arrested, Goodman's Uncle, Willie Cain, was arrested and Mirandized at the police station using the same form as Goodman's. Cain's form, like Goodman's, had both a "yes" and a "no" box checked regarding whether or not the suspect wished to make a statement. That form, which had the check in the "no" box crossed-out, also contained the initials "W.C." next to it, and Joffrion admitted that it appeared as though a mistake had been made.

4

The government next called FBI Agent Glenn Methvin, who received a phone call indicating that Goodman had been arrested, prompting him to the Plaquemine police department where Goodman was detained in order to take him into federal custody. Methvin testified that he received the phone call around 3:30 p.m. and did not arrive at the police department where Goodman was detained until sometime between 5:30 p.m. and 6:30 p.m. that same day. At the time Methvin arrived, Goodman was on a cigarette break and, after his break was over, was taken to a place similar to a booking room for interviewing and was handcuffed to a bar. Methvin indicated that when he arrived at the police department, he asked whether Goodman had been read his Miranda rights and received an affirmative answer. After receiving the Miranda form that Goodman signed, Methvin stated that he went over the form with Goodman, although not in great detail, and asked him whether he knew the form, had read the form and, although he did not formally read Goodman the Miranda warnings per se, asked Goodman if he had signed the form and was willing to talk, to which Goodman replied "yes." Based on Goodman's demeanor and interactions, Methvin believed that Goodman was willing to speak with him. Two other FBI agents participated in the interview.

Methvin then proceeded to interview Goodman, and indicated that no promises were made, no threats levied, no guns drawn, and no physical touching or

5

other intimidation used. Goodman responded appropriately to Methvin's questions. On cross-examination, Methvin could not recall whether the Plaquemine police officers had offered to record his interview of Goodman, but stated that he probably would have declined such an offer as it was FBI policy not to record interviews. Methvin admitted to noticing that a camera was present in the interview room after the fact, but that no video recording had been done.

Finally, the defense submitted the police report of Officer Scott Blackley, who made the initial traffic stop of Goodman that led to his arrest. Goodman wanted the report included in the record to show that no mention was made of a Miranda warning being given at the time Goodman was arrested and placed in the backseat of the police car. The district court, after admitting the report, stated that, even assuming that no Miranda warning was given at the time of the arrest, "we have another witness who came here and said he did give [Goodman] his Miranda warnings. . . . And we do have this discrepancy about both boxes being checked, and we have explanations about that."

The district court then found as follows:

> . . . It is my finding that Mr. Goodman was Mirandized at the scene when he was arrested. More importantly, he was reMirandized at police headquarters in Plaquemine when he arrived there. It is true that both boxes saying yes and no were checked by the - - investigation officer. And the . . . sequence of it was explained by him and there isn't anything to contradict that. [Goodman] expressed

6

a willingness to talk about his situation . . . The Plaquemine police officers did not discuss it with him.  Instead, they simply held him for the arrival of the [FBI]. . . . Agent Methvin went over the Miranda form to be sure that Mr. Goodman understood it, that he in fact signed it. . . . He determined and made sure that Mr. Goodman indeed was willing to and wanted to talk to him at that point in time.  I find that at no time did Mr. Goodman ever ask for the services of a lawyer or at least at no relevant time. . . . Whatever statement he made to the agents was made by him freely and voluntarily after having been adequately informed of his <u>Miranda</u> rights.

Thereafter, the district court declared a mistrial because, due to a medical condition, Goodman was unable to properly assist his lawyers in his defense. Shortly after the mistrial was declared, the government filed a superseding indictment that included two special findings by the grand jury: (1) that the National Bank of Commerce in Duluth, Georgia, was a financial institution and (2) that Goodman made a threat of death during the commission of the instant crime.  Goodman again pled not guilty.

Ultimately, the court presented a redacted indictment and, after the jury returned a general verdict of guilty on the bank robbery count, asked the jury to make the two additional special findings on a special verdict form.  The jury found Goodman guilty of the robbery and further found, beyond a reasonable doubt, that the bank was a financial institution and that Goodman had made a death threat during the commission of the robbery.

A presentence investigation report ("PSI") reflected that Goodman's base

offense level was 20 pursuant to U.S.S.G. § 2B3.1. Goodman then received a two-level enhancement because property of a financial institution was taken, U.S.S.G § 2B3.1(b)(1), and another two-level enhancement because a threat of death was made during commission of the offense, U.S.S.G. § 2B3.1(b)(2)(F). Goodman received no reductions for a total offense level of 24. Goodman's criminal history category was calculated at VI which, at offense level 24, provided for a guidelines sentence of 100-125 months' imprisonment. Goodman sought a downward departure pursuant to U.S.S.G. § 5K2.0, arguing that the conditions of his confinement were "atypical" and overly restrictive.

At the sentencing hearing, the court heard from Goodman regarding his treatment during pre-trial incarceration and ultimately denied the downward departure, first finding that it did not believe it had the authority to downwardly depart on the basis of complaints surrounding administrative actions taken by prison authorities but, even assuming it had that authority, it was disinclined to do so under the circumstances. The court did, however, indicate that it could take into account Goodman's pre-trial custody when deciding where to fix a sentence within the applicable guidelines' range.

After hearing from Goodman and the government, the district court decided that "it's a middle of the range case and I think a middle of the custody guideline

8

range is appropriate.  And in doing that, I am taking into account and giving him some small credit for the complaints he makes about his pretrial custody." Goodman was then sentenced to 112 months' imprisonment, the middle of the applicable guidelines range.

## I. <u>Miranda</u> Rights

On appeal, Goodman argues that the totality of the circumstances demonstrate that he did not knowingly and voluntarily waive his <u>Miranda</u> rights and initiate a conversation with law enforcement officers.  Specifically, Goodman argues that the discrepancy in the waiver form coupled with the fact that Goodman was handcuffed to a bar, questioned by three FBI agents without a recording despite the availability of a video camera, and not specifically given a renewed <u>Miranda</u> warning prior to being questioned by the FBI call into doubt his statements.

We review "the district court's findings of fact on a motion to suppress evidence for clear error and the district court's application of the law to those facts de novo."  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997).  "It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of his <u>Miranda</u> rights.'"  <u>Id.</u>  When considering a ruling on a motion to suppress, all

facts are construed in a light most favorable to the successful party. United States v. Behety, 32 F.3d 503, 510 (11th Cir. 1994). Finally, we will not reverse a district court's factual findings unless "contrary to the laws of nature, or . . . so inconsistent or improbable on [their] face that no reasonable factfinder could accept [them]." United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004).

In Miranda v. Arizona, the Supreme Court considered the scope of the Fifth Amendment privilege against self-incrimination and held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation from the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Accordingly, the Supreme Court delineated the following procedure that, although not constitutionally mandated, safeguards the right against compelled self-incrimination: (1) before a person in custody is interrogated, he must be informed in clear and unequivocal terms of his right to remain silent; (2) the admonition against self-incrimination must be accompanied by an explanation that anything said can and will be used against the individual in court; (3) the person must be clearly informed that he has the right to consult with a lawyer and to have a lawyer with him during the interrogation; and (4) the advice of the right to counsel must

10

be accompanied by the explanation that, if the person is indigent, a lawyer will be appointed to represent him.  Id. at 467-73, 86 S.Ct. at 1624-27.

As with most rights, the accused may waive the right against self-incrimination, so long as the waiver is voluntary, knowing, and intelligent. Id. at 444, 86 S.Ct. at 1612.  A waiver is effective where the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension."  Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (quotation omitted).  Where a defendant invokes his right to remain silent, the interrogation must cease.  Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627.  However, where a defendant only asserts his right to remain silent, and does not invoke his right to counsel, law enforcement may resume the interrogation at some later time.  United States v. Bosby, 675 F.2d 1174, 1182 (11th Cir. 1982).

In the present case, the district court's conclusion that Goodman understood his rights and knowingly and voluntarily waived them is amply supported.  At the time of his arrest, the undisputed testimony was that Goodman was read his Miranda rights.  Later, at the Plaquemine police department, Goodman was again read his Miranda rights, this time off of a form that Goodman was also permitted to read and required to sign.  Notwithstanding the fact that a discrepancy existed on

11

Goodman's Miranda waiver form as to whether Goodman, after hearing his Miranda rights, wanted to make a statement, the undisputed evidence was that immediately after Officer Joffrion had checked the "no" box, Goodman began volunteering information regarding the commission of his crimes. It was at that point that Joffrion checked the "yes" box on the form and, importantly, neither Joffrion nor any other Plaquemine police officer questioned Goodman at that point.

Upon FBI Agent Methvin's arrival, Goodman was again shown the signed form and was asked if he had seen the form, signed the form, understood the form, and asked again whether he was, in fact, willing to speak with the FBI agents. Goodman responded in the affirmative and, at no point on the record, has there been even a suggestion of improper coercion, threats, or any other inappropriate means of securing a waiver and a confession. There is no requirement that an interview be recorded, even if a video camera is available and, based on the undisputed testimony at the hearing, the district court's conclusion that Goodman understood his Miranda rights and voluntarily spoke to law enforcement was well-supported.

As the district court noted, any discrepancy on the Miranda form was adequately explained and, while a better procedure may exist for curing such discrepancies, the district court found the testimony of the law enforcement agents

12

credible on this point, and we will not disturb a credibility determination. Viewing the facts in a light most favorable to the government, we conclude that the totality of the circumstances demonstrates that the district court's factual findings were not so improbable that no reasonable factfinder could accept them and, therefore, no reversible error occurred by admitting Goodman's post-arrest statements.

## II. Sentencing Under Booker

Goodman also appeals his sentence in light of United States v. Booker, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), arguing that the mandatory application of the guidelines was in error. Goodman concedes that he failed to raise a constitutional challenge to his sentence and cannot meet the third prong of plain error review (that his substantial rights were violated), but he wishes to raise the issue to preserve it for certiorari with the United States Supreme Court.

Because Goodman failed to lodge an objection to his sentence based on Booker, Blakely, or any constitutional grounds, we will review for plain error only. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) cert. denied (June 20, 2005) (No. 04-1148). "An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." Id. at 1298 (quotation and citation omitted). "If all three conditions are met, an appellate court may then exercise its

13

discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

In Booker, the Supreme Court found that the mandatory nature of the Federal Guidelines rendered them incompatible with the Sixth Amendment's guarantee of a right to a jury trial. Booker, 543 U.S. at ___,125 S.Ct. at 749-51. The Court ruled that sentencing courts nevertheless must consider the Guidelines together with the factors set forth in 18 U.S.C. § 3553(a) when imposing sentences. Id. at ___, 125 S.Ct. at 765. Section 3553(a) provides that district courts imposing a sentence must consider, inter alia, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for adequate deterrence, protection of the public, the pertinent Sentencing Commission policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a).

The Court cautioned, however, that not every sentence will give rise to a Sixth Amendment violation, nor would every appeal lead to a new sentencing hearing. Booker, 543 U.S. at ___, 125 S.Ct. at 769. The Court instructed reviewing courts to apply "ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." Id.

Here there was no Sixth Amendment violation because all of the facts used to judicially enhance Goodman's sentence were found by the jury beyond a

reasonable doubt in a special verdict. However, we have held that where a district court imposes a sentence under the formerly binding mandatory guidelines, there nevertheless exists plain statutory error under Booker. See United States v. Shelton, 400 F.3d 1325, 1330-31 (11th Cir. 2005). To prevail, however, Goodman must prove that the error affected his substantial rights by demonstrating "a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case." Rodriguez, 398 F.3d at 1301. Where "[t]he record provides no reason to believe any result is more likely than the other," a defendant cannot prevail under plain error review. Id.

Here, there is no evidence even suggesting that Goodman would have received a different sentence under an advisory guidelines regime. The court had discretion to sentence Goodman within a range of 100-125 months under the guidelines as they were calculated and, rather than exercise its discretion to sentence Goodman to the lowest possible sentence, it chose to sentence Goodman to 112 months' in the middle of the guidelines range, stating on the record that this was " a middle of the range case and I think a middle of the custody guideline range is appropriate." Given that imposition of the lowest possible sentence within the range is insufficient, standing alone, to satisfy the third prong of plain error

15

review, the imposition of a sentence above the lowest possible sentence forecloses the possibility of showing a reasonable probability of a different outcome. See United States v. Fields, No. 04-12486, slip op. at 2301 (11th Cir. May 16, 2005) (holding that a sentence at the low end of the guidelines range alone is not enough to carry the burden under plain error review because it is too speculative).

Thus, we conclude that Goodman's substantial rights were not violated when the district court sentenced him under the formerly mandatory Sentencing Guidelines. In light of the foregoing, we conclude that Goodman has demonstrated no reversible error warranting a reversal of his conviction or sentence. We, therefore, affirm.

**AFFIRMED.**